**Russell Wayne ANDERSON, Plaintiff,**

v.

**USAIR, INC., Defendant.**

**Civ. A. No. 85–523.**

United States District Court, District of Columbia.

Sept. 30, 1985.

---

Mary P. Porter, Washington, D.C., for plaintiff.

William F. Sheehan, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

STANLEY S. HARRIS, District Judge.

This case now is before the Court on cross-motions for summary judgment. Be-

fore the Court also is the plaintiff's motion to amend his complaint. The plaintiff, Russell Wayne Anderson, challenges the rule of the defendant, USAir, Inc., which excludes blind persons from the emergency exit row seats on USAir's commercial aircraft. The Court concludes that the plaintiff has failed to show that the seating rule violates the Rehabilitation Act, the Federal Aviation Act, or those portions of the Constitution upon which he has based his claims. The Court also concludes that the plaintiff has asserted no state law claim upon which he may recover. In light of the untimeliness and superfluity of the plaintiff's motion to amend his complaint, the Court finds that it should be denied.

The Court readily can understand the desire of blind people to be treated equally with sighted persons to the greatest extent feasible. Nevertheless, there are situations in everyone's life in which a degree of autonomy must be given over to others in the interest of the safety and well-being of oneself and of others. This case presents such a situation. In this, the worst year in civil aviation history from the standpoint of the number of fatalities, the interest in air safety demands that every air passenger defer to the expertise of air transportation safety authorities and relinquish a measure of autonomy.

### Facts

On February 6, 1985, Mr. Anderson and three companions boarded USAir Flight 371 at Washington National Airport. Mr. Anderson was assigned seat 12–C, which is located in the row which serves the overwing emergency exit on DC–9 aircraft. As he attempted to take his seat, a flight attendant advised him that the seat was in an emergency exit row and requested him to move to a seat in a non-emergency exit row. Mr. Anderson contends that he was told that he could not sit in the emergency exit row because he is blind. He also contends that he was told that there was a Federal Aviation Administration (FAA) policy prohibiting blind individuals from sitting in emergency exit rows. When Mr.

Anderson refused requests to move by three USAir officials, he was arrested and left the plane. Mr. Anderson's refusal to move and the ensuing discussions delayed the flight's departure by 58 minutes.

Mr. Anderson was taken to the FAA police station, where USAir officials told him that he could travel to his destination that evening on the next available flight. He also was read a statement of USAir's policy regarding emergency exit row seating, although he was never given a copy of the policy. Eventually, he requested a ticket for the next day on USAir, and he was released without charges.

On February 7, 1985, Mr. Anderson returned to the airport. He approached the USAir ticket counter and requested seat 12–C on the flight for which he had been issued a ticket the day before. He was accompanied by some 50 people; the media had been alerted of the possibility of a demonstration at the airport. A USAir ticket agent told Mr. Anderson that he could not sit in seat 12–C. When Mr. Anderson insisted, the agent read a statement of USAir's policy. Mr. Anderson declined to sit elsewhere. Consequently, the agent refused to issue Mr. Anderson a boarding pass.

Mr. Anderson and the group with him attempted thereafter to board the plane without a boarding pass. When a USAir employee offered to get him a pass, Mr. Anderson asked for each of the five seats in the emergency exit row. He was told they were all assigned. Without having been issued a pass, he attempted to board when the boarding began, but he was stopped at the jetway. Eventually, the plane departed without Mr. Anderson. Mr. Anderson and his supporters returned to the ticket counter and staged a demonstration until 11:00 p.m., roughly six hours after they had come to the airport.

The complaint in this action was filed the next day, February 8, 1985. Coincidentally with the filing of this suit, the National Federation of the Blind released to the press a statement that the suit had been filed and that a nationwide shutdown of

USAir was planned to protest discriminatory seating policies.

Mr. Anderson's claims are based on section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; section 404(a) of the Federal Aviation Act, 49 U.S.C. § 1374(a); 14 C.F.R. § 121.586(b) (1985); and the commerce clause and the due process clause of the Constitution. He also alleges a tort of outrage, breach of his contractual rights, and a violation of the obligation of USAir as a public carrier to provide equal and courteous service to all.

*Claims Under the Rehabilitation Act*

Section 504 of the Rehabilitation Act reads as follows:

> No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

This section "seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate,* —— U.S. ——, 105 S.Ct. 712, 722, 83 L.Ed.2d 661 (1985). In this case, the program receiving federal assistance is air travel. The plaintiff does not assert that he was excluded from participation in or denied the benefits of air travel. Indeed, USAir made numerous offers to transport Mr. Anderson on flights of his choosing in non-emergency exit row seats. Mr. Anderson claims, rather, that he was subjected to discrimination in air travel within the meaning of § 504.

As enacted, § 504 did not provide for administrative implementation of its mandate against discrimination. The Civil Aeronautics Board began an extensive rulemaking process in 1979 which ultimately resulted in regulations that left a great deal of discretion to the airlines.[1] The preamble to the regulations itself expressly suggested that it would be within an air carrier's discretion to request "handicapped passengers, along with children and others who might have trouble opening an emergency exit, not to sit in exit rows," even though able-bodied passengers would be permitted to sit there. 47 Fed.Reg. 25939 (June 16, 1982). Although the CAB did not require such a request, it gave explicit approval for the adoption of such a policy by the airlines.

In addition to the preamble, the regulations require that a request by the air carrier be safety-related or necessary for the provision of air transportation. 14 C.F.R. § 382.3(c)(3)(ii) (1985). The request in this case is based on USAir's policy, filed with the FAA pursuant to 14 C.F.R. § 121.586, which provides in relevant part:

> During boarding, and throughout your flight, do not allow the following passengers to be seated in the Emergency Exit rows:
>
> —incapacitated passengers
> —children (12 and under)
> —women/men with babies
> —elderly/senile passengers
> —prisoners
> —blind passengers
> —obese passengers

This policy was designed to comply with FAA requirements that (1) an air carrier must be able to evacuate the passengers on an aircraft within a period of 90 seconds, and (2) the carrier ensure that access to emergency exit windows is free from obstruction. *See* 14 C.F.R. §§ 121.291(a), 25.-803(c), 121.310(f)(3) (1985). It is clear that the policy is not directed toward discriminating against blind people, since the policy addresses any class of individuals which, in USAir's opinion, would impede the evacuation of an aircraft.

The FAA's Civil Aeromedical Institute conducted several studies related to seating and evacuating handicapped passengers, one of which resulted in the conclusion that

---

1. The rulemaking procedure is discussed in extensive detail by the United States Court of Appeals for the District of Columbia Circuit in

*Paralyzed Veterans of America v. C.A.B.,* 752 F.2d 694, 696–703 (D.C.Cir.1985).

the average ambulatory handicapped passenger ... could be seated anywhere in the cabin except in an exit row or a primary overwing exit route, where he might impede the early stages of an evacuation or be injured by the rush of other passengers. Egress by way of overwing exits on aircraft without wing-to-ground descent devices would expose handicapped passengers to injury.

Upon consideration of the study and hearings it held, the FAA recommended in an advisory circular that blind passengers "should be seated in areas in which evacuation would normally occur through a floor level, non-overwing exit." *See* FAA Advisory Circular 120–32 (Mar. 25, 1977).

The DC–9 aircraft serving the USAir flights on which Mr. Anderson sought to travel are designed with emergency exit rows which lead to non-floor level, overwing exits without wing-to-ground descent devices. There are three different procedures for opening the windows of USAir's various aircraft. Once a passenger in an overwing exit row has opened the window, he or she must ascertain whether the wing is intact, not on fire, or otherwise unsafe. Once on the wing, he or she must determine whether descent can be made from the wing in light of the possibility that the plane may be resting on a cliff, there may be sharp objects on the ground, or there may be fire or water on the ground. It is not just the blind (or other handicapped) person's safety the policy is designed to protect, but the safety of all passengers. Although Mr. Anderson's filings have shown that there are blind individuals who may be able to make these determinations in some circumstances, assuredly he has not shown that blind people as a class are so qualified. 14 C.F.R. § 121.586; 47 Fed. Reg. 25,939.

■ Under the CAB's final regulations, § 504 protects only "qualified handicapped persons." *Paralyzed Veterans of America v. C.A.B.*, 752 F.2d 694, 719 (D.C.Cir. 1985). The study by the Civil Aeromedical Institute, the recommendation by the FAA, and the regulations all support USAir's policy determination that safety requires the exclusion of blind passengers from emergency exit row seating. Because the policy against seating blind passengers in emergency exit rows is safety-related and is not discriminatory, the Court finds no violation of § 504 of the Rehabilitation Act.

*Claims Under the Federal Aviation Act*

Section 404(a) of the Federal Aviation Act, 49 U.S.C. § 1374(a), requires air carriers to provide safe and adequate service. Mr. Anderson claims that USAir's policy regarding the seating of blind people violates this section.

■ There is no provision in the Federal Aviation Act for a private cause of action under § 404(a). The Department of Transportation and the FAA have the sole power to enforce the duty of providing safe and adequate service. 49 U.S.C. §§ 1421(a)(6), 1471, 1472, 1482(d)(3), 1487, 1511(a); 49 U.S.C. § 106(g) (1985 Special Pamphlet). *See Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1414 (9th Cir.1984) (no private cause of action under § 404(a) for airline's arrest of blind person with guide dog for refusal to sit in bulkhead seat); *Diefenthal v. C.A.B.*, 681 F.2d 1039, 1049 (5th Cir.1982), *cert. denied*, 459 U.S. 1107, 103 P.2d 732, 74 L.Ed.2d 956 (1983) (adequate service provision in § 404(a) did not create a private cause of action).[2]

■ In that there is no private cause of action and Congress has given designated agencies enforcement authority, Mr. Anderson must look to the agencies for relief before looking to this Court. *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1983). Both the FAA and the De-

---

**2.** Section 404(b) had been held to provide a private right of action for discriminatory conduct in air transportation, but Congress repealed that section with no suggestion that thereby a private cause of action had been created under section 404(a). *See Nader v. Allegheny Airlines*, 512 F.2d 527, 537 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

partment of Transportation—as the successor to the CAB—have procedures in place for processing private complaints. *See* 14 C.F.R. § 13.5 (1985); 14 C.F.R. § 302.201–.206. Such procedures include filing a complaint about a violation of the Federal Aviation Act or an agency rule, investigation by the agency, and, in the case of the FAA, the issuance of cease and desist orders, compliance orders, civil penalties, or the seeking of enforcement in the district court. In the case of the Department of Transportation, formal enforcement proceedings may be instituted if a complaint is found to be based on reasonable grounds.

Mr. Anderson has not pursued his remedies with either administrative agency, each of which has jurisdiction over his claim. His claim must be dismissed since there is no private right of action under § 404(a) and he has failed to exhaust his administrative remedies.

### Claim Under FAA Rule 121.586

Mr. Anderson apparently has conceded the failure of his original claim that USAir's policy of excluding blind passengers from exit rows is inconsistent with the policies that USAir has filed with the FAA and therefore is in violation of 14 C.F.R. § 121.586. That issue was not addressed in the opposition to USAir's motion and was dropped in plaintiff's amended complaint. The Court addresses this claim, however, since the amended complaint will not be accepted.

█ The affidavit of Robert Berkebile, USAir's director of customer service system (filed May 25, 1985) reveals that the policy regarding emergency exit rows has been contained in both USAir's Flight Attendant Emergency Manual and its Passenger Service Manual. According to Mr. Berkebile's affidavit, both of those manuals were filed with the FAA Air Carrier District Office 38, which is the FAA office charged with USAir's inspection. Therefore, the exclusionary policy is the same policy filed with the FAA and could not be inconsistent with the filed policy of USAir under FAA Rule 121.586.

### Constitutional Claims

In his complaint, Mr. Anderson states that USAir's "exclusionary policy violates fundamental rights secured by the United States Constitution including the right to travel; the Commerce Clause and the Due Process Clause of the Fifth Amendment." In addition, in his motion for summary judgment, Mr. Anderson raises a claim of equal protection.

█ In order to establish an equal protection claim under the fifth amendment and the commerce clause, Mr. Anderson would have to show the involvement of a state actor. USAir, a private corporation, privately funded, is not made an arm of the state or federal government by the fact that it holds a certificate to operate from the federal government. *See Brown v. District of Columbia Transit System, Inc.,* 523 F.2d 725, 727 (D.C.Cir.), *cert. denied,* 423 U.S. 862, 96 S.Ct. 121, 46 L.Ed.2d 91 (1975). Regulation by the federal government does not transform USAir into a state actor. *See Rendell-Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky,* 457 U.S. 991, 1007–08, 102 S.Ct. 2777, 2787–88, 73 L.Ed.2d 534 (1982). USAir does not necessarily become a state actor by its receipt of federal or state assistance. *See Rendell-Baker v. Kohn,* 457 U.S. at 840, 102 S.Ct. at 2770–71. Finally, USAir's request to the FAA police to remove Mr. Anderson from the airplane does not constitute state action. *See Dahlberg v. Becker,* 748 F.2d 85 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). Therefore, Mr. Anderson has not shown the required state action to support his equal protection claim. Even had state action been shown, Mr. Anderson has not shown that blindness is a suspect classification requiring strict scrutiny under the fifth or fourteenth amendments. USAir's policy satisfies the rational basis test on the basis of the safety considerations involved, the study regarding the seating of handicapped passengers, the recommendation of the FAA, and the CAB suggestions

regarding blind passengers and emergency exit row seats.

With regard to Mr. Anderson's claim under the commerce clause, the Court finds that there has been no showing as to how commerce has been burdened by USAir's policy. The restriction applies to only two of 22 rows in this particular type of aircraft and is safety-related. Similarly, the Court finds that Mr. Anderson has not alleged specific facts to support his claim that his right to travel was denied. USAir offered a seat to Mr. Anderson on his choice of flights on both February 6 and 7 in any non-emergency exit row. At all times, USAir has stood ready to transport Mr. Anderson. Reasonable safety restrictions on the flights are permissible and have not curtailed Mr. Anderson's right to travel. *See United States v. Davis,* 482 F.2d 893, 912–13 (9th Cir.1973) (airport searches do not violate right to travel). Accordingly, Mr. Anderson's claims under the Constitution must be dismissed.

### Claims Under State Law

In Count Five of his complaint, Mr. Anderson states that USAir's policy and the efforts of its agents in procuring the arrest of Mr. Anderson constitute a "tort of outrage." In Count Six, Mr. Anderson alleges that USAir's policy and its agents' actions violated his contractual rights and USAir's "obligation as a public carrier to provide equal and courteous service to all."

The Court finds first that Mr. Anderson has not set forth facts sufficient to state a cause of action for outrage in his complaint or in the pleadings filed thereafter. The tort of outrage requires that the underlying conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 comment d (1965). It is for the Court to determine "in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or

whether it is necessarily so." *Id.* at comment h. *See also Hingson v. Pacific Southwest Airlines,* 743 F.2d 1408, 1416 (9th Cir.1984). Nowhere in the filings is there alleged conduct satisfying any of those standards. Rather, USAir's actions were in accord with both its published procedures and the FAA's recommendations. Consequently, the Court finds that USAir is entitled to summary judgment on this claim.

The Court next turns to Mr. Anderson's claim that USAir breached its contract of carriage in failing to transport him in an emergency exit row seat. No specific term or condition of the contract is alleged to have been breached, however. Furthermore, there is no provision in the contract between the parties specifying a passenger's right to sit anywhere in the plane. The tickets issued by USAir incorporate by reference USAir's Terms of Transportation under which "USAir may refuse to transport, or may remove from any flight, any passenger [who] ... (2) attempts to interfere with any member of the flight crew in the pursuit of his/her duties, ... or (4) engages in any action that might jeopardize the safety or comfort of other passengers." Finally, the Terms of Transportation explicitly limit USAir's liability for refusal to transport, stating that "USAir is not liable for its refusal to transport any passenger or for its removal of any passenger in accordance with the above paragraphs but USAir will provide the applicable involuntary refund." Mr. Anderson received such a refund through a credit on a TWA ticket. Thus, the contract provided for Mr. Anderson's removal when he attempted to interfere with the flight crew's duties which were imposed by the Flight Attendant Emergency Manual and when he engaged in actions jeopardizing the safety of other passengers by refusing to comply with a policy based on safety considerations. Since USAir's contract also limits its liability for refusing to carry Mr. Anderson to a refund which he has received, Mr. Anderson cannot recover on this theory of liability.

 The Court finally finds that Mr. Anderson's claim that USAir's policy violated USAir's obligation as a common carrier to provide service is based on a state law duty that has been expressly preempted by Congress in an amendment to the Federal Aviation Act. The Act provides in pertinent part that:

> [N]o State or political subdivision thereof ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide interstate air transportation.

49 U.S.C. § 1305(a)(1). The legislative history is clear that this Act and regulations issued thereunder preempted any state laws relating to air carrier services. *See* H.Rep. No. 1211, 95th Cong., 2d Sess. 15–16 *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 3737, 3751–52. Such services include the regulation of air carrier seating policies for handicapped passengers. *See Hingson*, 743 F.2d at 1415–16. Moreover, the common law of common carriers was not revived by the repeal of § 404(b) since the repeal was part of the same legislation which enacted the preemption provision. Thus, Mr. Anderson has no basis for his claims for USAir's alleged violation of its obligation as a public carrier.

### Motion for Leave To Amend the Complaint

The Court has considered Mr. Anderson's motion for leave to file an amended complaint. Ordinarily, leave is freely given when justice requires it under Fed.R.Civ.P. 15. The Court finds in this case, however, that prejudice and expense would inure to the defendant without a significant offsetting benefit. Therefore, justice requires that the motion be denied.

As noted in the facts, this case was filed with unusual speed—on the day after the second of the deliberately planned precipitating incidents. Approximately a month later, a status conference was held, at which time the parties agreed to a discovery and briefing schedule. More than three months after the complaint was filed, discovery was closed; ten days thereafter plaintiff's motion was filed with the parties' cross-motions for summary judgment. If the amended complaint alleged facts unknown prior to completion of discovery, the delay in amending the complaint would be understandable. However, an analysis of the amended complaint shows that no new facts are alleged to justify adding four counts. Furthermore, a fifth additional count would require additional discovery and is only tangentially related to the incident upon which the complaint is based. Finally, the remaining changes are superfluous.

 In light of the lateness of this motion, in that the parties had agreed to a schedule and were well on their way toward disposition, the unnecessary delay that would be caused by the amendment of the complaint, and the absence of new facts to justify the delay in moving to amend the complaint, the Court finds that the motion to file an amended complaint must be denied.

### Conclusion

For the foregoing reasons, and upon consideration of Mr. Anderson's motion for leave to file an amended complaint, the opposition thereto, and the reply, it hereby is

ORDERED, that the motion is denied.

Upon consideration of the defendant USAir's motion for summary judgment, the plaintiff Russell Anderson's motion for summary judgment, the respective responses thereto, and the entire record herein, it hereby is

ORDERED, that USAir's motion for summary judgment on all claims is granted. The Clerk shall enter judgment for USAir and dismiss with prejudice all claims brought against it. It hereby further is

ORDERED, that Mr. Anderson's motion for summary judgment is denied.

SO ORDERED.