Joel R. DAVIS

v.

Edwin MEESE, III, et al.

Civ. A. No. 86–2467.

United States District Court, E.D. Pennsylvania.

July 11, 1988.

Timothy M. Cook, Thomas K. Gilhool, Michael Churchill, Public Interest Law Center, Philadelphia, Pa., for plaintiff.

Vaughn Finn, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## OPINION AND ORDER

VAN ARTSDALEN, Senior District Judge.

■ The issue in this difficult, but non-complex, litigation is whether the Federal Bureau of Investigation (FBI) may preclude all insulin-dependent persons who have diabetes from being employed by the FBI in the job categories of special agent and investigative specialist. This depends upon whether such preclusion violates Section 504 of the Rehabilitation Act of 1973

1. Section 504 of the Rehabilitation Act, 29 U.S. C. § 794 provides in pertinent part: "[n]o otherwise qualified individual with handicaps ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination ... under any program or activity conducted by any Executive agency."

(Rehabilitation Act), 29 U.S.C. §§ 791–796h (1985 & Supp.1988). Section 504 prohibits federal executive agencies from discriminating against handicapped persons solely because of their handicaps.[1] I conclude from the facts established after a full trial on the merits that the FBI's policy of excluding insulin-dependent diabetics from applying for the job classifications of special agent and investigative specialist does not violate the Rehabilitation Act and does not violate the due process clause of the fifth amendment. Consequently, judgment will be entered in favor of defendants and against plaintiff.

## FINDINGS OF FACT

### I. Procedural Facts

1. Plaintiff, an insulin-dependent diabetic, filed the complaint against defendants seeking class certification on behalf of all diabetics who have been or will be denied employment as special agents or investigative specialists with the FBI because of their diabetes.

2. No motion for class certification was ever filed. Plaintiff's counsel, representing Joel B. Davis individually, orally advised the court on August 27, 1987, that he did not intend to seek class certification. By memorandum and order dated September 16, 1987, intervention by Timothy A. Cramer as an individual party plaintiff was denied.[2] In the same order, class certification was denied.

3. Although no formal written order was entered on the cross-motions for summary judgment, I ruled from the bench immediately prior to trial that "it would appear to me quite obvious that there are many facts that are in dispute. The [joint] pretrial order itself sets forth many disputed facts some of which appear to me to

2. Mr. Cramer, an insulin-dependent diabetic, had unsuccessfully sought to apply for a position as either a special agent or an investigative specialist with the FBI at the Omaha, Nebraska, field office. Aside from Joel R. Davis, the record discloses no other insulin-dependent diabetic who ever sought to apply for the job of special agent or investigative specialist or who was turned down from making application because of being an insulin-dependent diabetic.

be material, in addition to which this case is listed for trial." The case thereupon proceeded to trial on the merits. (Notes of Testimony at 1.2, March 21, 1988).

## II. Mutually Agreed Facts

(Taken verbatim from the Joint Pretrial Order)

4. Plaintiff Joel R. Davis has insulin-dependent diabetes. Mr. Davis has successfully completed his academic degree at the baccalaureate level in business. In 1980, he graduated from Philadelphia Textile College with a bachelor of science degree in business administration.

5. Joel R. Davis was hired by the FBI in 1983 as a clerk. He was subsequently promoted to the position of accounting technician.

6. In the Spring of 1985, Mr. Davis applied for the positions of investigative specialist and special agent. His applications were rejected because of his diabetes.

7. Mr. Davis accepted the FBI's invitation to apply for the investigative specialist training program. Such invitations are extended to those FBI employees who meet the threshold education requirements and have sufficient employment experience with the FBI. The individuals responsible for issuing such invitations were unaware that Mr. Davis had insulin-dependent diabetes when they invited him to apply. Additionally, Mr. Davis applied to the FBI for employment as a special agent. Mr. Davis meets all of the FBI's threshold requirements for submitting an application for these positions other than the fact that he has insulin-dependent diabetes.

8. Mr. Davis did not undergo the full application procedure for either the special agent or investigative specialist positions.

9. Defendant Edwin Meese, III, is the Attorney General of the United States, and defendant William Sessions is the Director of the FBI. They are each responsible for the employment policies and practices of the FBI and the execution of those policies.

10. The FBI is responsible for investigating violations of over 200 federal criminal laws.

11. The majority of the FBI's work is devoted to investigating federal criminal violations, including in the areas of organized crime, narcotics, white collar crime and terrorism, and conducting foreign counterintelligence.

12. The FBI employs approximately 9,300 special agents and 13,000 support personnel.

13. The FBI is composed of 59 field divisions and FBI Headquarters. Each field division is organized and operated along similar lines. Field division personnel include one special agent in charge, one or more assistant special agents in charge, one or more squad supervisors, and special agent personnel of varying numbers, depending on the size of the field division, and investigative specialists. The field divisions are located in various cities throughout the United States and its territories, and their location generally corresponds to the geographic distribution of federal judicial districts. Field divisions range in size from over 1,000 special agents in the New York Field Division to under twenty special agents. The Philadelphia Field Division, with about 300 special agents, is the fifth largest in the nation, behind New York, Washington, Los Angeles, and Chicago.

14. FBI Headquarters is composed of ten divisions and the Office of Congressional and Public Affairs. The ten divisions consist of the Identification, Training (Quantico), Administrative Services, Records Management, Intelligence, Criminal Investigative, Laboratory, Technical Services, Legal Counsel, and Inspection Divisions. Generally, each division is composed of sections and each section is composed of one or more units. Not all divisions have sections, however, and not all sections are composed of units. The substructure of the organizational components is determined by the size and functions of the division.

15. Each division is managed by an assistant director and one or more deputy assistant directors. The positions of assistant and deputy assistant director are normally held by special agent personnel.

Sections are managed by section chiefs and assistant section chiefs, and these positions are normally held by special agent personnel as well. Units are supervised by unit chiefs, positions normally held by special agent personnel also. Sections and units (and specialized subunits) are staffed by special agent personnel and support personnel. The number of sections and units (as well as the personnel complement of each) varies according to the responsibilities or functions assigned.

16. Special agent personnel are stationed throughout the fifty-nine field divisions and FBIHQ. Investigative specialists are assigned to certain field divisions.

17. The investigative responsibilities of the field divisions consist of: (1) criminal investigations, (2) foreign counterintelligence investigations, (3) applicant background investigations, and (4) administrative matters. Each field division, regardless of its geographic location and personnel complement, is composed of squads, the basic operational unit. The number of squads per field division varies. Squads are managed by special agent supervisors staffed by varying numbers of special agent personnel, and supported by the appropriate number of non-special agent, support personnel. Squads are assigned specific investigative responsibilities (*e.g.*, criminal, foreign counterintelligence, applicant background and/or administrative). Special agent personnel are responsible for the management and conduct of such investigative efforts. Support personnel provide the necessary logistical and technical assistance.

18. The position of investigative specialist, special support group was created during the 1970's to provide technical and operational assistance to special agents. The job of the investigative specialist consists exclusively of surveillance in the foreign counterintelligence area.

19. The interview process for special agent applicants consists of a three-member panel of trained interviewers who are themselves special agents with varied investigative experience and who generally have a minimum of three years' service as a special agent. The interview is highly structured and is targeted to elicit behavioral responses to enable the interviewers to assess the applicant in eight dimensions that are considered job-related. These dimensions are: initial impact, oral communication, current events, resourcefulness, range of interest, interest and motivation to become an FBI agent, accomplishments, and overall impression. A maximum of 55 points is attainable on the interview portion of the job application procedure, with a minimum qualifying score being required for further consideration.

20. There are five programs under which an applicant can apply to be a special agent. These programs are Law, Accounting, Language, Engineering/Science and Diversified. An applicant applying under the Law program must be a graduate of a state-accredited law school with at least two years of undergraduate work at an accredited college or university. All other programs require a four-year college degree from an accredited school, as well as specialized education, ability, and/or work experience (3 years) appropriate to the program. In addition to the five entrance programs, there are two more selection categories—female and minority—reflective of the FBI's affirmative action needs. To be included in either of these categories, an applicant must first meet the threshold requirements for one or more of the five entrance programs.

21. A basic concept of the current FBI applicant selection system is that all applicants compete only against the other candidates in their respective selection programs. The selection process consists of three phases—testing, interview, and background investigation—in that order. The tests and interview are the initial screening devices and, in order to advance from one stage of processing to the next, an applicant's scores must be competitive with those of other candidates in the same program. Life experiences, accomplishments, and demonstrated motivation, as opposed to test and interview scores, assume major importance in making final appointive decisions regarding those applicants who reach

the background investigation phase. The FBI's aim at any given time is to select for appointment the best available candidates from each selection category. During the period May, 1985 to June, 1986, 514 special agents were hired from the following programs: 116 Law; 67 Accounting; 32 Engineering/Science; 33 Language; and 266 under the Diversified Program. Between January, 1985 and November 1987, 28,718 applicants were tested for the special agent position. Of these 1,687 actually entered on duty.

22. Candidates for special agent positions are eligible to apply and begin their processing when they are within a specified time of meeting all the threshold requirements for the programs under which they intend to apply. Applicants who apply under the Accounting, Language and certain categories of the Engineering/Science Program are initially required to take specialized tests to assess their ability in their field of expertise. Applicants who successfully pass the specialized test in their field can then take the test battery given to all special agent applicants regardless of the programs under which they are applying. This battery, called the Special Agent Entrance Examination (SAEE), is considered predictive of job performance based on the most current information about the abilities and traits required for the special agent position. The SAEE consists of five parts, including a memory test and a reading comprehension test. The five parts make up one test and are graded as such for a total maximum point value of 45. Minimum qualifying scores have been established for each selection category based on the need for specific candidates from that particular program. All applicants who achieve the minimum qualifying score that has been established for their particular entrance program(s) are eligible to move on to the interview phase of the selection system, described above.

23. The total of the test and interview scores, known as the Percentile Ranking Grade (PRG), is the basis for the final ranking of all special agent candidates, both within their particular programs, and on a general listing that includes all individuals in the system, regardless of program. Selections for further processing are based on the FBI's specialized needs at the time, with those who attain a qualifying PRG being selected.

24. Those individuals who are chosen for further consideration undergo a complete physical examination to ascertain their physical fitness for duty as a special agent. Those who are found medically acceptable to perform strenuous physical activities are then subjected to a pre-employment physical fitness test to ensure that, if selected for an appointment, they will report for training in proper physical condition. The fitness test is designed to provide an excellent indication of the candidate's body strength, muscle endurance, abdominal muscle endurance, cardiovascular endurance and body fat composition. Individuals who advance to this stage of the processing also undergo a thorough background investigation designed to further determine the candidate's suitability for employment.

25. In an effort to make the selection system more flexible and take into consideration "life experiences," in addition to test and interview scores, the FBI utilizes a "broad-band" selection concept in making final selections for appointment. This entails ordering background investigations for considerably more applicants than for which the FBI has vacancies, but allows the agent program managers making appointive decisions the opportunity to evaluate the total background of a number of highly ranked candidates whose scores are within the same general range, and base final class selections on the totality of the information in each applicant's case. Each candidate's overall qualifications are carefully weighed against those of the other individuals in competition for appointments, which helps to insure that applicants with demonstrated records of high achievement in the academic and/or employment fields will not be overlooked simply because their PRG is slightly lower than that of some other candidates whose overall records are perhaps less impressive.

26. Candidates competing in the FBI's current Special Agent Selection System can be considered under more than one program if they have the necessary qualifications, and there is a provision for all applicants to be reprocessed one time only, at least one year after the initial administration of the entrance examination, if they so desire. There is no limitation on the number of times an applicant can take the specialized tests.

27. The special agent is the principal investigative official of the FBI. The work of the special agent involves investigating violations of federal criminal law, including reacting to crimes, making arrests, collecting evidence of crimes, conducting surveillances, serving warrants, subpoenas and investigative demands, and testifying in federal judicial proceedings. Special agents also have primary responsibility for conducting counterintelligence activities within the United States and its territories.

28. The position of special agent is multifaceted in nature. The special agent must be able to accept a variety of assignments, including making arrests, collecting evidence, conducting surveillances, serving warrants and subpoenas, undertaking investigations, and testifying in federal judicial proceedings. Many of the tasks required of the special agent involve periods of strenuous physical exertion and physical and mental stress. Many assignments, such as raids and arrests, require the practical use of firearms and physical force. Special agents may be called upon, either singlehandedly, or in the company of others, to apprehend suspects, many of whom are armed and dangerous and have records of violent criminal activity.

29. Special agents carry firearms at all times while engaged in their official duties.

30. The job of the investigative specialist consists exclusively of surveillance activities in the foreign counterintelligence area.

31. The FBI does not have a general policy of denying employment to persons with diabetes. Persons with diabetes are free to apply for support positions within the Bureau, and the FBI currently employs approximately sixty persons with diabetes in support positions.

32. The FBI permits persons whose diabetes is controlled by diet or hypoglycemic agents to apply for the special agent and investigative specialist positions and receive consideration on a case-by-case basis.

33. The FBI does, however, exclude persons with insulin-dependent diabetes from the positions of special agent and investigative specialist.

34. The central characteristic of diabetes is the inability of the pancreas to secrete sufficient insulin to insure the body's proper functioning. There are two broad categories of diabetes. The first, or autoimmune type of diabetes, was previously called "juvenile onset type" but is now commonly referred to as "insulin-dependent diabetes mellitus" or Type 1 diabetes. This form of diabetes, which primarily affects young people but can occur at any time of life, results from an autoimmune destruction of the beta cells, the insulin-producing cells. ("Autoimmune" refers to the body dealing with a part of itself as if it were a foreign invader.)

35. The second type of diabetes, which has its onset mainly in mid- or later life, was previously called maturity-onset-type-diabetes, and is now referred to as "non-insulin-dependent diabetes" or Type II diabetes. This form of diabetes results from a mixture of mild to severe beta cell deficiency as well as an inability of insulin to work effectively on the body's tissues, mainly as a result of overnutrition, obesity, physical inactivity and other factors, some of which are inherited.

36. Insulin is a hormone that is essential for the proper use and storage of sugar (glucose) in the body. This hormone is secreted by the beta cells of the pancreas and, like a thermostat and cooling coil in a refrigerator, maintains the body with a relatively constant concentration of various fuels, of which glucose is the most important. Insulin facilitates the passage of glucose across many cell membranes where the glucose is used as a source of energy by the body, including the brain, which is

dependent on a sufficient concentration of glucose to meet its needs. Insulin also promotes the conversion of excess glucose into a storage form of sugar, known as glycogen, in the liver. As the level of glucose in the blood falls, insulin secretion stops and glycogen in the liver is broken down and released into the bloodstream as glucose. Thus, insulin, acting with the liver, maintains a relatively constant level of glucose in the bloodstream. Insulin also promotes the conversion of glucose into fat. During fasting, this fat is used as a fuel by the body.

37. Because food is a major source of glucose for the body, the secretion of insulin and the intake of meals work closely together. In the nondiabetic individual, as each meal is eaten, there is a release of insulin from the pancreas which is proportional to the size and composition of the meal.

38. A pancreas in a person without diabetes secretes a small amount of insulin at all times. Additionally, after a meal is eaten, the typical pancreas releases larger amounts of insulin, which then dissipates relatively quickly, bringing the body back to the baseline level.

39. Because a person with insulin-dependent diabetes has a pancreas that does not secrete insulin, insulin must be introduced into the system to mimic the action of the pancreas in a person without diabetes.

40. The regimen that most individuals with diabetes traditionally have followed is to take fixed amounts of insulin at certain times of the day. This regimen is satisfactory for persons who are able to eat meals at reasonably foreseeable times. For persons who need or desire to postpone or skip a meal now and then, however, this regimen is not satisfactory.

III. Additional Findings of Fact

41. Prior to April 29, 1987, the FBI had a policy of refusing to process an application for employment as a special agent or investigative specialist if the applicant reported a history of diabetes. After consultation with and advice by Dr. Cahill, an expert in the field of diabetes, the policy was changed on or about April 29, 1987—approximately one year after the present action was filed. Thereafter, based on Dr. Cahill's recommendations, only diabetics who were insulin dependent were excluded from having their applications for such job classifications processed and considered. Presently, applicants who have a history of diabetes, but whose diabetes is controlled by diet alone or diet and oral hypoglycemic agents, are considered on a case-by-case basis; *i.e.*, if an applicant has a history of diabetes but is not insulin dependent, the application will be processed. (Exhibit D–2).

42. Plaintiff Joel R. Davis, who is an insulin-dependent diabetic, filed an application for appointment as a special agent. In accordance with FBI policy, his application was not further considered or processed when he set forth on the application that he had diabetes. No inquiry was made as to the extent or nature of the diabetic condition, nor was any history taken of any hyperglycemic or hypoglycemic occurrences, nor was any individualized assessment made as to whether he was physically and mentally capable of performing the essential functions of the special agent or investigative specialist positions.

43. There are approximately 250 federal violations, for which the FBI has investigative responsibilities as the investigative arm of the Department of Justice. (Notes of Testimony at 1.46, March 21, 1988 and at 2.20, March 22, 1988). A substantial amount of the investigative work conducted by special agents consists of routine office work and carefully planned and scheduled meetings and interviews, involving normal working hours with no heavy physical exertion.

44. When a particular investigation requires the coordinated activities of several or a group of special agents, such as occurs during a raid of a suspected illegal operation, the duty assignments are ordinarily carefully planned in advance by FBI supervisors or FBI agents in charge and personnel are given particular assignments in order that the FBI can "out-plan, out-gun and out-man" any possible physical or violent

resistance. Frequently, however, a special agent may be given an assignment in a "reactive situation," where preplanning is not possible either as to the probable length of time of the assignment or as to the physical requirements and potential hazards of the assignment. In any given situation requiring utilization of more than a single special agent, certain assignments are obviously more physically demanding, hazardous and uncertain than others, but predictability in advance as to the risks of an assignment are at best uncertain, especially in "reactive situations" where prompt assignments are crucial.

45. Special agents are trained and required to be able to perform all tasks of the job at all times. This includes active participation in raids, undercover activities, surveillances, interviewing suspects and witnesses, and other similar duties, any of which may unpredictably become hazardous and involve extended periods of work without any available relief. Assignments do include occasions when regular meals are substantially delayed or omitted. Assignments also involve situations requiring intensive and extreme physical exertion, such as searching or apprehending suspects on foot in rough and difficult terrain.

46. Investigative specialists, although involved only in surveillance activities, also have physically demanding assignments that frequently have long, irregular and uncertain hours of work, including night and day surveillances of high speed moving vehicles whose destinations are unknown. Surveillance activities, to be successful, require that the investigative specialist remain inconspicuous and unobserved by the person being followed. In the field of international and counterintelligence, agents are frequently trained in techniques for discovering and eluding those who may be following them. Investigative specialists on assignments are frequently required either to substantially delay or forego regular meals.

47. Although special agents and investigative specialists frequently work on assignments in teams, both also frequently engage in assignments alone without other personnel accompanying them and without so-called "back-up" assistance available.

48. An excessively high blood-sugar level in the bloodstream creates hyperglycemia. Unchecked hyperglycemia causes diabetic ketoacidosis, a condition that can be fatal within a matter of days to several weeks. Sustained hyperglycemia causes renal and kidney dysfunction, blindness and other very serious and life-threatening complications. The serious dangers posed when the pancreas produces no insulin or grossly deficient amounts of insulin thereby creating hyperglycemia develops relatively slowly, over a matter of days, and ordinarily can be temporarily corrected by injections of insulin which lower the blood sugar level of the bloodstream. All of the experts who testified in this case agree that the danger of hyperglycemia does not create a serious impediment to an insulin-dependent diabetic being able to perform all of the job functions of a special agent or investigative specialist because of the relatively gradual onset, easy detection and correction of the condition for most insulin-dependent diabetics.

49. Hypoglycemia, in contrast to hyperglycemia, is a condition in which the blood sugar level in the bloodstream is excessively low. Glucose (sugar) is normally replenished in the bloodstream through the ingestion of food containing carbohydrates. The body utilizes the glucose during normal physical and mental activities. Increasing amounts of glucose are utilized during heavy physical exertion. The brain requires a constant supply of glucose to function efficiently. In a normal person, when a meal is eaten, the pancreas secretes a substantial amount of insulin which tends to keep the blood-sugar level from rising too high after food intake of glucose and carbohydrates. The insulin-dependent diabetic receives subcutaneous injections of insulin to lower the blood-sugar level. If too much insulin is injected or the intake of carbohydrates is abnormally reduced, such as through a delayed or missed meal, there is danger of the sudden onset of hypoglycemia.

50. A hypoglycemic condition can occur very suddenly and unexpectedly and can be either mild or severe. Among the recognized effects of a hypoglycemic occurrence are sweating, feeling of hunger, pounding of the heart, fatigue, tremors, anxiety, mental confusion, and in severe occurrences, the inability to function without assistance, loss of consciousness, seizures and even death. Every insulin-dependent diabetic is constantly at risk of a hypoglycemic occurrence even under fully controlled conditions. Fully controlled conditions exist when the scheduling of meals and diet and the amount of physical exertion are regular and pre-planned, and the amount, type and timing of insulin injections can be predetermined. When the scheduling of the intake of carbohydrates through ingestion of food is uncertain, or meals are long delayed or missed, or unexpected heavy physical exertion is required, controlling the appropriate blood-sugar level of insulin-dependent diabetics becomes more complex and the risks of a severe hypoglycemic occurrence substantially increase.

51. Most insulin-dependent diabetics become aware through experience when their blood-sugar level becomes abnormally low. Because of their "body awareness," some diabetics, even without testing equipment, can correct low blood-sugar levels by ingesting food or glucose tablets. However, without accurate testing equipment there is no sure way of determining the need for added carbohydrate intake to raise the blood sugar level to a normal range. Severe hypoglycemic occurrences frequently have a very sudden and unexpected onset, especially among those who are unable to test their blood sugar level or whose "body awareness" fails to warn them in time.

52. There is no way to predict accurately the probability or frequency of an insulin-dependent diabetic having a severe hypoglycemic episode, which would render such person unable to function without assistance. Some diabetics are more susceptible than others both as to frequency and severity. Dr. Cryer, plaintiff's expert, opined that the majority of insulin-dependent diabetics would not be able to meet the physical requirements of a special agent or an investigative specialist and that "certainly all would not" (Notes of Testimony at 2.222, March 22, 1988) because of the danger of severe hypoglycemic occurrences while on assignment. Some insulin-dependent diabetics never experience a severe hypoglycemic occurrence, and are able to control their blood sugar levels at nearly normal levels throughout their working careers.

53. Dr. Cryer recommends a program of "intensive" or "flexible" therapy for insulin-dependent diabetics whose scheduling of meals and work activities are uncertain and irregular. This program or regimen attempts to closely mimic the insulin production and secretion of a normal person. It requires an injection of a basal amount of a long-acting insulin, such as ultralente, once or twice a day. In addition to the basal insulin injection, supplemental injections of short-acting or regular insulin are made immediately prior to each meal based on the amount of carbohydrates expected to be consumed during the meal. The supplemental injections should be taken only after a blood-sugar level test is made to assist in determining the amount of insulin to inject. (Notes of Testimony 2.229–2.230, March 22, 1988). To utilize this method, the individual would be required to have thorough training and experience, high intelligence, and be "terribly motivated." (Notes of Testimony 2.231, March 22, 1988). The blood-sugar level should be tested at least several times a day. Dr. Cryer agreed that such a regimen was "not for everyone."

54. The chance of a sudden and unexpected hypoglycemic episode could be reduced by maintaining a higher than normal blood-sugar level through the utilization of a reduced amount of the basal level or long acting insulin. However, because of the risks of long term complications from adopting a maintenance of higher than normal blood sugar level, Dr. Cryer would not recommend such a course of therapy. (Notes of Testimony 2.222, March 22, 1988).

55. A blood-sugar testing kit with a digital read-out, together with a syringe, needles, and an adequate supply of insulin

sufficient for several days' use can be carried in a light-weight package a little larger than a pack of king-size cigarettes or about the size of a small pocket radio. Insulin can be injected into the body through normal clothing. Blood-sugar testing, determining the amount of insulin to inject, and injecting the insulin can be done by a well-trained and experienced person in about two minutes. However, there must be adequate light to read the digital test report and to adjust the proper amount of insulin to be injected. The procedure would be difficult to do in public without being readily observable. If the blood-sugar test results showed a higher than normal figure, or if a meal were about to be eaten, an injection of a quantity of insulin would compensate. After experience and training the diabetic would be able to judge the proper amount of insulin to inject. If the blood-sugar test result established an abnormally low level, the diabetic could raise the level by eating food containing carbohydrates, such as crackers, or by eating small, easily carried glucose tablets.

56. Many insulin-dependent diabetics through experience become aware when their bodies have an abnormally low blood sugar level such as is likely to bring on a hypoglycemic occurrence. Feelings of hunger, queasiness, anxiety, headaches and similar mild reactions are frequently recognized as forewarnings and allow a diabetic to correct the blood sugar level by ingesting some form of carbohydrates. Other insulin-dependent diabetics have a medically recognized "hypoglycemic unawareness," which means that they do not have any forewarning of dangerously low blood sugar levels and impending severe hypoglycemic episodes. Whether an insulin-dependent diabetic is subject to hypoglycemic unawareness can best be determined on the basis of that person's history of hypoglycemic occurrences and whether such occurrences were preceded by any forewarning. However, even among those persons who normally have recognizable forewarnings, severe hypoglycemic episodes have been known to occur without any forewarning. Thus, an insulin-dependent diabetic's history is not an accurate or completely reliable guide as to the likelihood that, if there is danger of a severe hypoglycemic occurrence, the person will be aware of the danger in advance.

57. According to Dr. Cryer, an insulin infusion test is a reliable guide to determine who, among the insulin-dependent diabetics, is at relatively greater risk of having a severe hypoglycemic occurrence when placed on his recommended intensive or flexible therapy. However, the test "does not exclude the possibility that someone who has passed the test would never have an episode of hypoglycemia." (Notes of Testimony 2.224, March 22, 1988). The test infuses insulin into a vein at a predetermined rate for a period of two hours. The test determines by measurement how rapidly and how low the blood sugar level is reduced by the insulin. Also, during the test, the subject is constantly questioned to determine if the brain function is in any way impaired by the low blood sugar level. If the test establishes some brain dysfunction or the blood sugar level falls too low, the subject is classified as having inadequate glucose counter regulation. Studies establish that persons having inadequate glucose counter regulation (*i.e.*, those who would have failed the insulin infusion test) have a twenty-five times higher likelihood of a severe hypoglycemic episode than those who have adequate glucose counter regulation and who would therefore be classified as passing the test.

58. Tests were conducted upon a volunteer group of insulin-dependent diabetics to determine the frequency of severe hypoglycemic occurrences, defined as occurrences that temporarily disabled the person and required the person to have assistance from another person. Two control groups were established. One group was placed on conventional therapy, which means a fixed quantity of insulin was injected daily. The other group was placed on intensive flexible therapy of the type that Dr. Cryer would recommend if any insulin-dependent diabetic were employed by the FBI as a special agent or an investigative specialist. The tests established that those on intensive therapy had two and one-half times

greater risk or likelihood of having a severe hypoglycemic occurrence than those on conventional therapy. According to Dr. Cryer's calculations, the tests would establish that an average person on the intensive therapy would have a severe hypoglycemic occurrence once every two years. The tests merely establish the statistical average. They provided no guide as to the susceptibility of any particular individual. The frequency and severity of severe hypoglycemic episodes among insulin-dependent diabetics varies widely from person to person. Likewise, an individual's past history, although a helpful guide, can make no accurate prediction as to possible future severe hypoglycemic occurrences.

59. Aside from the risk of a severe hypoglycemic occurrence, an insulin-dependent diabetic is able to perform any of the tasks of a special agent and an investigative specialist, assuming such person meets all of the other physical and mental qualifications. Except for their insulin injections and frequent blood sugar level testing, some insulin-dependent diabetics lead normal, active lives and never have a severe hypoglycemic episode. Others frequently have severe hypoglycemic episodes, despite following appropriate prescribed insulin control regimens.

60. There is an ever present risk that an insulin-dependent diabetic will have a sudden and unexpected severe hypoglycemic occurrence. History and testing, such as an insulin infusion test, are helpful in predicting the probability that an individual will suffer a severe hypoglycemic occurrence, but there is presently no test that can reliably predict whether, when and under what precise circumstances an individual will have a severe hypoglycemic occurrence. However, the risk increases as the lifestyle becomes irregular as to work hours, uncertain mealtimes and diets, and unplanned heavy or extreme physical, mental and emotional stress.

61. Insulin-dependent diabetics have been employed by and satisfactorily performed full-time duties on various city police forces and with the United States Customs Service.

62. The Drug Enforcement Agency and the Secret Service of the Treasury Department exclude insulin-dependent diabetics from serving as special agents. The Department of Transportation's motor carrier safety regulations prohibit insulin-dependent diabetics from operating trucks in interstate commerce. 49 C.F.R. § 391.41(b)(3) (1987). The Federal Aviation Administration excludes insulin-dependent diabetics from being certified as commercial pilots. 14 C.F.R. §§ 61.123(c), 67.-15(f)(1) (1988).

63. The FBI does allow temporarily disabled special agents to perform limited duty. However, if the disability is permanent, the special agent is not retained for limited duty, unless the agent has had extensive experience and is capable of serving in a purely administrative position. Only a small percentage of special agents are at any time on limited duty. No special agent has ever been hired solely for limited duty or for any particularized duty.

64. There are no limited duty assignments available for investigative specialists.

65. In many work situations, if a special agent or investigative specialist has a severe hypoglycemic occurrence, it could endanger co-workers who might be on assignment with the special agent or investigative specialist, members of the public including potential witnesses, victims and suspects, as well as the special agent and/or investigative specialist himself or herself.

66. The FBI has an extensive support staff which includes such specialists as accountants, linguists, biologists, engineers, computer programmers and electronic technicians. Many of the so-called support personnel receive pay scales equal to or greater than those of special agents and investigative specialists. Insulin-dependent diabetics are not disqualified from any of the support personnel positions.

67. Because of personnel limitations placed on the FBI by financial and other constraints imposed by Congress, the FBI could not provide "reasonable accommodation" to insulin-dependent diabetics by per-

manently assigning them only limited duties or refraining from sending them on assignments that would substantially increase the risk of a severe hypoglycemic occurrence without deteriorating the services provided to the public and compromising the functions of the FBI. Employing persons as special agents or investigative specialists for limited duty only would also impose extra duty of the more rigorous kind upon those on regular duty, which would have a harmful effect on the overall morale of the special agents and investigative specialists of the FBI and the FBI as a whole.

## DISCUSSION

The decision to be made in this case depends primarily upon conflicting medical opinions as to the risk of an insulin-dependent diabetic having a severe hypoglycemic occurrence while on a duty assignment. The basic facts and the statutory and case law applicable are not in substantial contention. The professional medical opinions, as expressed by the extremely well-qualified experts in the specialty of treatment and control of diabetes who testified in this case, are in basic disagreement over whether insulin-dependent diabetics can safely perform all of the essential functions of special agents and investigative specialists.

Dr. Cryer testified as plaintiff's expert and Dr. Cahill and Dr. O'Brian testified for the government. All agreed that not all insulin dependent diabetics would be able to meet the requirements and perform the essential functions of the jobs. Dr. Cryer opined that he "suspect[ed] the majority would not." (Notes of Testimony 2.222, March 22, 1988). All the medical experts also agreed that there is presently no test or method of screening that can exclude the possibility that an insulin-dependent diabetic will ever have a sudden and unexpected severe hypoglycemic occurrence. The difference of professional opinions between plaintiff's and defendants' medical experts appears to be a disagreement over what is an acceptable degree of risk, considering the nature of the job assignments and the probability that an individual will have a severe hypoglycemic occurrence while on a job assignment. Dr. Cryer opined that determinations could be safely made on a case-by-case basis. Dr. Cahill and Dr. O'Brian testified that because of the ever-present risk of a sudden and unexpected hypoglycemic occurrence, no such determination could be made and that all insulin-dependent diabetics should therefore be excluded. No medical expert quantified the probabilities, because the circumstances that might induce a severe hypoglycemic occurrence while on an assignment are so varied as to make predictions in percentages of chance or probability too uncertain.

The evidence is clear that the only substantial danger of an insulin-dependent diabetic serving as a special agent or investigative specialist is the danger that such person will have a sudden and unexpected hypoglycemic episode while on an assignment which would render such person temporarily unable to function physically and/or mentally without immediate assistance from some other person or persons. Such an event could have dire consequences, endangering completion the assignment, the safety of co-workers, the public, and the diabetic. Because of the sensitive and sometimes physically dangerous nature of many FBI investigations and surveillances, including suspected international terrorists and saboteurs, it is not at all fanciful to conceive of tremendous damage and extreme danger to the government and the public if an investigation or a surveillance is disrupted or lost because a single special agent or investigative specialist has an incapacitating hypoglycemic episode while on a duty assignment.

The expressed medical opinions concur that all insulin-dependent diabetics are constantly at risk of a hypoglycemic occurrence, and that blood sugar levels must be maintained within recognized limits through frequent blood sugar level testing and proper diet control. The experts also agree that any insulin-dependent diabetic who is prone to hypoglycemia would not be qualified for either of the job categories at issue.

Plaintiff argues that determination of who, among the insulin-dependent diabetics, is or is not qualified must be made on an individualized case-by-case basis. The difficulty with this seemingly logical solution is that there exists no reliable method of determining in advance those insulin-dependent diabetics who do not present a substantial risk of having a sudden and unexpected severe hypoglycemic episode while on a duty assignment. The experts agreed that under certain circumstances which might arise while on a duty assignment, any insulin-dependent diabetic would be at risk of having a severe hypoglycemic occurrence. There are tests, such as the insulin infusion test, which are helpful in predicting those insulin-dependent diabetics who are more likely to have severe hypoglycemic occurrences and also helpful in predicting those more likely to have frequent and recurring severe hypoglycemic occurrences. However, the evidence fails to establish that any known technology may, on any individualized case-by-case basis, reliably predict the probability or frequency that any individual insulin-dependent diabetic would have a sudden and unexpected severe hypoglycemic occurrence in the future. No known method establishes, within reasonable medical certainty, that the risk as to any individual is nonexistent, minimal, or even very small, or any basis to quantify such risk in any and all situations reasonably likely to occur on the job.

■ An insulin-dependent diabetic is clearly a "handicapped person" within the meaning of the Rehabilitation Act. *See School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed. 2d 307 (1987) (tuberculosis); *Bentivegna v. United States Dept. of Labor,* 694 F.2d 619 (9th Cir.1982) (diabetes).

Under the law, plaintiff may not be excluded because of his handicap if he is "otherwise qualified." An "otherwise qualified" handicapped person is one "who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed. 2d 980 (1979). Under regulations that have

been adopted to implement the Rehabilitation Act, a "qualified handicapped person" is defined as

a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others. . . .

29 C.F.R. § 1613.702(f) (1987).

In most cases, to determine whether a person is otherwise qualified, an individual fact-specific inquiry should be made. As stated by the Supreme Court in *School Board of Nassau County:*

Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivation based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.

480 U.S. at 287, 107 S.Ct. at 1131. From this and other case law, plaintiff argues that categorical disqualification of insulin-dependent diabetics violates both the Rehabilitation Act and the Due Process clause by establishing an irrebuttable presumption of disqualification.

■ Although blanket exclusions are generally unacceptable, legitimate physical requirements are proper even though such requirements may, in effect, exclude an entire class. *See Southeastern Community College,* 442 U.S. at 407, 99 S.Ct. at 2367. If the requirements are directly connected with and substantially promote legitimate safety and job performance concerns and are tailored to those concerns, then such requirements may be held valid notwithstanding that they effect a group or class rather than a single individual. *Bentivegna,* 694 F.2d at 621–22.

Exclusions of persons with various types of handicaps have been upheld in several different situations. *E.g., Sharon v. Larson,* 650 F.Supp. 1396 (E.D.Pa.1986) (persons needing bioptic eyeglasses excluded from obtaining driver's license because of serious danger to others); *Local 1812, American Federation of Government*

*Employees v. Dept. of State*, 662 F.Supp. 50 (D.D.C.1987) (persons infected with AIDS excluded from State Department Foreign Service posts); *Anderson v. USAIR*, 619 F.Supp. 1191 (D.D.C.1985), *aff'd*, 818 F.2d 49 (1987) (prohibiting seating of blind persons next to emergency airplane exits). Without commenting on the validity of these and other cases decided under the Rehabilitation Act where generalized exclusions of certain handicapped persons from jobs and various benefits were upheld without requiring individualized considerations, I conclude that the case law firmly supports the proposition that restrictions and exclusions applying generally to a particular type of handicap or physical or mental condition may be upheld if the restrictions are legitimately and directly related to reasonable health and safety concerns and the ability to perform satisfactorily the essential tasks of the job.

The evidence in this case establishes that the FBI's exclusion of all insulin-dependent diabetics from applying for positions as special agents or investigative specialists is rationally based on valid medical opinion and on health and safety concerns for fellow employees, members of the public, including potential law violators, victims of criminal activity and innocent by-standers, and the handicapped persons themselves. If a method of testing could be devised which reliably determined whether certain individual insulin-dependent diabetics presented no or very little reasonably probable risk of a severe hypoglycemic occurrence while on an assignment in a situation where such an occurrence could pose a serious risk of damage or harm to co-workers, the public or the individual, then the blanket exclusion of all insulin-dependent diabetics would be invalid. Unfortunately, such is not the case.

Based on studies and histories of test subjects, Dr. Cryer testified that an insulin infusion test "provides very useful information" (Notes of Testimony 2.224, March 22, 1988) as to those insulin-dependent diabetics who are at substantially greater risk of hypoglycemia (Notes of Testimony 360, March 24, 1988). Dr. O'Brian, an expert witness for defendants, agreed that an insulin infusion test may well be "an effective predictor of individuals susceptible to hypoglycemia," but that "there's no single test that's going to, I feel, reduce the likelihood of hypoglycemic reactions to an acceptable level given the type of work we're describing here. Yes, I do believe it would segregate out a subset of people who would be very likely to develop hypoglycemia." (Notes of Testimony at 21, March 24, 1988). However, Dr. Cryer testified that, even among those who "passed" the test, eight percent nevertheless had a severe hypoglycemic occurrence (Notes of Testimony 3.61, March 23, 1988); the extrapolated event rate of such an occurrence would be approximately once every ten years. Unfortunately, studies establish that an insulin-dependent diabetic who is placed on the intensive or flexible insulin therapy has a two and a half times greater risk of a severe hypoglycemic occurrence than would the same person on conventional therapy. Nevertheless, because of the irregular work schedules of the jobs at issue, Dr. Cryer opined that, if employed as a special agent or investigative specialist, an insulin-dependent diabetic should be placed on the intensive or flexible therapy. Dr. Cryer conceded that by utilizing his recommended therapy there would be a substantial risk of a severe hypoglycemic occurrence if a subject took an injection of insulin immediately before eating a meal, and if the meal and/or some form of carbohydrate or glucose became unavailable or was missed because of job constraints.

Plaintiff argues, in substance, that the risks presented to an insulin-dependent diabetic who might be employed as a special agent or investigative specialist are highly exaggerated. Those risks stressed by defendant include missing meals, irregular work hours, unplanned extreme physical and emotional stress, nighttime surveillance where it would be impossible to have sufficient artificial light to see the blood sugar level test results or measure an appropriate quantity of insulin for injection, being held hostage, being on assignment without assistance in the event of hypogly-

cemic episode, and similar dangerous situations. Plaintiff contends that the likelihood of a thoroughly trained, experienced and well-motivated insulin-dependent diabetic having a severe hypoglycemic episode while on assignment in a situation that would thereby pose a danger to any co-workers, the diabetic, or any other person is almost negligible. Although defendants may be unduly alarmed as to the likelihood and frequency of such situations, the evidence is convincingly clear that special agents and investigative specialists have frequently been placed in situations where, if they were insulin-dependent diabetics, they would have been in real and substantial danger of a severe hypoglycemic occurrence because they would have been unable to timely test and/or correct a low blood sugar level.

It is abundantly clear that except during a severe hypoglycemic episode, an insulin-dependent diabetic is as physically and mentally capable of performing all of the functions of a special agent and an investigative specialist as any other similar person who does not have diabetes. The government does not contend to the contrary. During a severe hypoglycemic occurrence, however, such a person is incapacitated and cannot function either physically or mentally without assistance.

Plaintiff's counsel argues that the FBI must make reasonable accommodation for those insulin-dependent diabetics who would otherwise qualify for employment as special agents and investigative specialists. If medical science could predict reliably and accurately when and under what job circumstances an insulin-dependent diabetic would have a severe hypoglycemic occurrence (or more precisely when and under what job circumstances such person will *not* have a severe hypoglycemic occurrence), some accommodation might be reasonable and required. Testing and investigation of a person's medical history may lower the odds or risks of a severe hypoglycemic occurrence while on assignment in a situation that would pose a threat to the safety of co-workers, the diabetic or others, but no expert or other witness testified that the risk would be nonexistent,

minimal or remote. All insulin-dependent diabetics are at risk of a disabling hypoglycemic occurrence and, because of the job requirements, those risks are substantially greater than in most job categories.

Plaintiff's counsel suggests that a reasonable accommodation would be to place insulin-dependent diabetics on permanent limited duty that would restrict them from assignments of the type that the government contends imposes unreasonable risks of harm. Plaintiff points out that there are special agents who are placed on temporary limited duty from time to time and that the number of potential insulin-dependent diabetics who would otherwise qualify for the job would be so few as to not disrupt the mission of the FBI or place an undue burden upon the agency.

The essential functions of a special agent and an investigative specialist require that certain assignments be hazardous, and they would be especially hazardous to a person who is insulin-dependent. There are no permanent limited duty assignments available to newly selected special agents, and there never have been. To force the FBI to create such a category, in consideration of congressional financial constraints, would seriously impede the basic function of the FBI. There are no limited duty positions available as an investigative specialist. Plaintiff's proposed accommodation would "impose an undue hardship on the operation of the program" and mission of the FBI. Where the accommodation imposes an undue hardship, such accommodation is not required under the Rehabilitation Act. *Prewitt v. United States Postal Service*, 662 F.2d 292, 310 (5th Cir.1981); 29 C.F.R. § 1613.702(f).

An essential function of the job of special agent requires that such person be able to perform all functions and assignments. Special agents are, in a sense, "general practitioners" in the field of federal criminal investigations. They are subject to transfer and assignment throughout the United States at any time. They must be able to serve on any and all types of squads. Accommodation of the type pro-

posed by plaintiff would require a "fundamental alteration" in the nature and description of the position of special agent and also of investigative specialist. Such is not a "reasonable accommodation" and is not required under the Rehabilitation Act. *Southeastern Community College*, 442 U.S. 397, 99 S.Ct. 2361.

In *School Board of Nassau County*, the Supreme Court advised that in making findings "courts normally should defer to the reasonable medical judgments of public health officials." 480 U.S. at ——, 107 S.Ct. at 1131. In a footnote to that passage, the Court left open the question of whether the Court should also defer to the reasonable medical judgments of private physicians on which an employer relies. *Id.* at n. 18. Significantly, in this case neither party challenged the qualifications of the other party's expert witnesses. Because of the divergence of medical opinion expressed by the experts, obviously complete deference cannot logically be given to each expert. Only by assessing the relative merit and strength of the opinions can a proper determination be made in this case. Defendants' experts contend the risk of an individual having a severe hypoglycemic episode while on a duty assignment is unacceptably high. Plaintiff's expert, while acknowledging the ever-present risk, finds this risk acceptable if applications are accepted only from those insulin-dependent diabetics who, by history and testing, demonstrate a substantially lower risk than other insulin-dependent diabetics.

In my view, Congress' intent in enacting the Rehabilitation Act was not that employers must accept applicants for jobs where eminently qualified medical specialists are of the opinion that the job requirements pose a reasonably probable risk of harm to the applicant and others by reason of the applicant's "handicap," in this case being that of an insulin-dependent diabetic. Where, as here, qualified medical opinion is divided as to what is an acceptable degree of risk, a decision must be made. To some extent that depends upon how one must weigh safety concerns against the laudable Congressional purpose of providing all handicapped persons an equal opportunity to compete in the job market. The evidence establishes that although the likelihood of a special agent or investigative specialist having a severe hypoglycemic occurrence while on a duty assignment may be small, such an occurrence presents the very real danger of serious harm to the special agent or investigative specialist, coworkers, and uninvolved third parties, as well as potential serious harm and disruption to the operation of the FBI in carrying out its proper governmental functions; based on this evidence, I conclude that the preclusion of insulin-dependent diabetics from employment as special agents and investigative specialist does not violate the Rehabilitation Act.

At some future time, medical science may be able to predict accurately on a case-by-case basis those insulin-dependent diabetics who present only a very slight or de minimis risk of having a severe hypoglycemic occurrence while on an assignment as a special agent or investigative specialist. Great strides have been made in recent years in the control of diabetes. In recognition of medical advances in controlling diabetes, the FBI recently modified its policy of excluding all persons who had been diagnosed as diabetic, and limited the exclusion to only those who were insulin-dependent. This was based on sound medical advice. It may be that in the future, as testing and treating techniques improve, exclusions on a case-by-case basis will be the only permissible procedure; or, hopefully, methods of control may become so exact that insulin-dependent diabetics will present no risk of ever having a severe hypoglycemic episode, in which case such persons would be clearly qualified to apply. Given the present state of medical knowledge, I conclude that excluding all insulin-dependent diabetics from applying for positions as special agents and investigative specialists does not violate either the letter or the spirit of the Rehabilitation Act.

Plaintiff also makes a due process claim that the disqualification of all insulin-dependent diabetics creates an invalid irrebuttable presumption that all insulin-dependent diabetics are incapable of perform-

ing the essential functions of the jobs at issue. Although the evidence suggests that some unidentifiable insulin-dependent diabetics may be able to perform the essential functions required, the undisputed medical testimony is that all insulin-dependent diabetics present a risk of not being able to perform all of the essential functions. There is no known reliable way to segregate those who can and those who cannot perform all of the essential functions. Because all of the excluded persons, *i.e.*, all insulin-dependent diabetics, present an unacceptable risk of being incapable of performing all of the essential functions based on the totality of the evidence, the "irrebuttable presumption" rule of *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 647–48, 94 S.Ct. 791, 799–800, 39 L.Ed.2d 52 (1974), and *Gurmankin v. Costanzo*, 556 F.2d 184 (3d Cir.1977), is inapplicable. There is no due process or other fifth amendment violation.

To the extent that the foregoing "Discussion" portion of this opinion contains additional findings of fact and/or conclusions of law not otherwise included under the "Findings of Fact" and "Conclusions of Law" portions of this opinion, the same shall be deemed as being so included.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties.

2. Venue in this district is proper.

3. The policy of the Federal Bureau of Investigation that precludes insulin-dependent persons with diabetes from applying for the job positions of special agent and investigative specialist does not violate the Rehabilitation Act.

4. The policy of the Federal Bureau of Investigation that precludes insulin-dependent persons with diabetes from applying for the job positions of special agent and investigative specialist does not violate the due process clause of the Fifth Amendment of the United States Constitution.

5. Plaintiff is entitled to no equitable or other relief.

6. Defendants are entitled to a judgment against plaintiff on all claims asserted in the complaint.