**Mark A. HOGARTH, Plaintiff,**

v.

**Richard THORNBURGH as United States Attorney General, Frank C. Carlucci as United States Secretary of Defense and John Doe as Head of White House Communications Agency, Defendants.**

**No. 88 Civ. 8366 (SS).**

United States District Court, S.D. New York.

Oct. 7, 1993.

Stuart L. Karlin, New York City, for plaintiff.

Mary Jo White, U.S. Atty. by Diana Hassel, Nancy Milburn, Asst. U.S. Attys., New York City, for defendants.

### MEMORANDUM OPINION AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff in this action, Mark A. Hogarth, contends that he was terminated from his position as a clerk with the Federal Bureau of Investigation ("FBI") because of a mental handicap, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The parties consented to try this case before me pursuant to 28 U.S.C. § 636(c), and this opinion constitutes my findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

*Background*

Mr. Hogarth joined the general clerical support staff of the FBI in 1981 as a copier-

duplicator operator. (Tr. 58).[1] At that time his duties consisted exclusively of duplicating documents. (Tr. 58). Like all FBI employees, he had a top secret security clearance. (Tr. 59). In 1982, he was promoted to communications operator, GS–4. (Tr. 59). In this position he operated a telephone switchboard, maintained radio contact with FBI agents in the field, did computer searches, and transmitted and received facsimiles and teletypes. (Tr. 59). Within a year he was promoted to communications operator, GS–5, though his responsibilities remained essentially the same. (Tr. 59–60). From the time Mr. Hogarth began working for the FBI until 1987, his performance evaluations were consistently good, and he received two commendations. (Tr. 60; Pl.Exh. 65–70). While employed by the FBI, he earned his bachelor's degree from the State University of New York in social sciences in 1983. (Tr. 57).

As a communications operator, Mr. Hogarth had access to classified documents that he was transmitting, receiving, and sometimes editing. (Tr. 125–26). Many of the communications were coded, but Mr. Hogarth himself was not a cryptographer and had no responsibility for creating, changing, or reading codes. (Tr. 126–27, 250–51). The subject matter of the communications included matters of national security such as counterintelligence, as well as sensitive criminal matters. (Tr. 112–13, 144).

In February 1987, Mr. Hogarth decided to avail himself of a promotional opportunity to work as an Afrikaans translator in the New York office of the FBI. (Tr. 62). He began an intensive language training program in Rosslyn, Virginia, but soon encountered difficulties. He started to feel overwhelmed and upset in class and to exhibit abnormal behavior. (Tr. 62–63). He neglected his assignments, began drinking alcohol at night, and laughed inappropriately in class. (Tr. 62–63).

The plaintiff also began to develop bizarre ideas. He came to believe that the Central Intelligence Agency ("CIA") would use him as an operative in South Africa. (Tr. 63, 82). Without advising anyone, Mr. Hogarth rented a car and drove toward Canada, planning to seek asylum. (Tr. 63). He soon turned back, however, and returned home to New York. (Tr. 63). On March 31, 1987, the plaintiff sent the FBI a false medical excuse that he himself had written. (Tr. 63, 82–83; Pl.Exh. 73). The note stated that Mr. Hogarth was suffering from a herniated disc and could only do sedentary work. Mr. Hogarth signed the name of a fictitious physician to the note. (Tr. 64; Pl.Exh. 73). He also resigned from the Afrikaans course, citing his purported health problem. (Tr. 83; Gov't Exh. B). On April 23, 1987, Mr. Hogarth submitted another falsified doctor's note which stated that he was permitted to resume work on a part-time basis. (Tr. 84; Gov't Exh. C).

Mr. Hogarth did return to work at the FBI on April 27, but his mental state continued to deteriorate. (Tr. 64). He believed that he was a doctor and handed out blank doctor's notes which he had signed with the name of the non-existent physician. (Tr. 85–86). He became obsessed with paranormal phenomena and thought that the CIA had devices with which it could alter brain waves. (Tr. 64–65). He believed that he was receiving coded messages from the CIA over the radio. (Tr. 90). At one point he felt he had died and gone to hell. (Tr. 90). He feared that a nuclear holocaust was imminent, and he called the Strategic Air Command in Omaha to issue a warning. (Tr. 90–91). In May, Mr. Hogarth had homosexual relations with another FBI employee at the agency's offices. (Tr. 65–66, 89; Gov't Exh. H).

On May 15, 1987, Mr. Hogarth was interviewed by two FBI agents concerning a number of allegations against him. He acknowledged engaging in sexual misconduct at the FBI office and creating the false doctor's note. (Tr. 66; Gov't Exh. I). However, he denied suggestions that he had considered selling secrets to the Soviet Union, and there is no evidence that he ever revealed confidential information. (Tr. 66, 132; Gov't Exh. I).

Mr. Hogarth was then placed on administrative leave at half-pay and barred from the offices of the FBI. (Tr. 67). His condition

---

1. "Tr." refers to the transcript of the trial held on June 14 and 15, 1993.

worsened, and he told Supervisor Special Agent W. Allen Bostdorff who interviewed him on June 2 that he was under constant surveillance and that his telephone was tapped. (Tr. 67, 121). He complained that the FBI was a neo-Nazi organization and that the National Security Council was misusing the FBI's technical capabilities. (Tr. 121). He had auditory hallucinations and believed he was receiving coded messages from the radio. (Tr. 67). Agent Bostdorff alerted FBI headquarters that Mr. Hogarth appeared to be deteriorating mentally, and the FBI advised the plaintiff's father that he should seek counseling for his son. (Tr. 121–22).

On June 6, 1967, Mr. Hogarth's father brought him to a psychiatrist, Dr. Lawrence C. Miller. (Tr. 18–19, 67). Dr. Miller, recognizing that the plaintiff was acutely mentally ill, recommended that he be hospitalized immediately, but Mr. Hogarth refused. (Tr. 19, 67). That night, however, the plaintiff was brought to the emergency room of Jacobi Hospital in the Bronx because of his disturbed behavior, and the next day he was transferred to St. Vincent's Medical Center on Staten Island where Dr. Miller was Director of Psychiatry. (Tr. 17, 19–20, 67).

Dr. Miller immediately treated Mr. Hogarth with the antipsychotic drug Trilafon and discharged him from the hospital five days later. (Tr. 20–21). In the course of continuing to treat Mr. Hogarth, Dr. Miller diagnosed him as suffering from bipolar disorder, manic type, sometimes referred to as manic-depressive illness. (Tr. 22). In addition to prescribing Trilafon, Dr. Miller placed the plaintiff on a regimen of lithium carbonate. (Tr. 22).

Throughout July 1987, Mr. Hogarth continued to display manifestations of mental illness. In two meetings with Agent Bostdorff he repeated allegations that his phone was tapped and that he was being watched, once suggesting that the FBI was engaging in surveillance from a "Roy's" ice cream truck. (Tr. 122–23; Gov't Exh. O, Q). At the second interview he presented Agent Bostdorff with two letters. Both were rambling, incoherent statements that Mr. Hogarth signed "Sergeant Pepper." (Tr. 68–69,

93; Pl.Exh. 89, 90). According to Mr. Hogarth, he was not regularly taking his Trilafon at this time. (Tr. 68, 93).

On July 29, the FBI sent Mr. Hogarth a letter advising him that it was considering dismissing him. The letter outlined three grounds for termination: the fraudulent claim of a back injury, sexual misconduct while on duty, and lack of candor in responding to questions about the sexual conduct. (Gov't Exh. R). The plaintiff then submitted a letter dated August 12, pleading not to be terminated. (Pl.Exh. 79). In this letter, Mr. Hogarth again admitted writing the false medical note and engaging in homosexual acts at the FBI offices, and he acknowledged withholding information about one FBI employee he knew to be homosexual in order to protect that individual's reputation, but he argued that these deviations had been caused by a mental illness that was now under control. (Tr. 257; Pl.Exh. 79). The FBI, however, rejected these contentions, and on September 23, 1987, it delivered to Mr. Hogarth a termination letter dated September 9. (Tr. 69–70; Gov't Exh. U). The plaintiff appealed his dismissal, but the Acting Director of the FBI upheld it in a letter dated March 17, 1988. (Gov't Exh. FF).

After Mr. Hogarth's condition was controlled with medication in the late summer of 1987, he did have occasional feelings of elation or depression and one instance where he felt he was being followed. (Tr. 28–29, 73, 246–47; Gov't Exh. CC at 9, 15, 19). In November 1990, the plaintiff was in a training program at the State Insurance Fund and the stress of his responsibilities led to what doctor Miller characterized as a "minor activation" of the stabilized bipolar disorder. (Tr. 44–46, 73; Gov't Exh. X). Mr. Hogarth's symptoms included sleep disturbances, difficulty concentrating, and fatigue. (Gov't Exh. X). In response, Dr. Miller adjusted his lithium treatment. (Tr. 29).

In late 1991, Mr. Hogarth had delusions that the FBI was watching him and had broken into his home. (Tr. 75, 55–56, 257; Gov't Exh. CC at 27). He also suspected his mother of informing on him to the FBI. (Tr. 46; Gov't Exh. CC at 29). In early 1992 the plaintiff contacted the Secret Service and

warned that he felt he was a threat to the President. A Secret Service agent contacted Dr. Miller who provided assurances that Mr. Hogarth was not dangerous. (Tr. 29; Gov't Exh. CC at 28). Dr. Miller then changed the plaintiff's drug regimen by eliminating Trilafon and substituting Stelazine, a more potent antipsychotic. (Tr. 46–47). Since October 1992, Mr. Hogarth has been working as a hospital care investigator, determining insurance coverage and assisting patients in filing Medicaid applications. (Tr. 79–80).

At trial, Dr. Miller testified that someone suffering from bipolar disorder experiences manic moods when he feels elated or grandiose, is charged with energy, requires little sleep, and becomes careless and reckless in judgment and behavior. (Tr. 21–22). It was Dr. Miller's opinion that the misconduct for which Mr. Hogarth was discharged from the FBI was attributable to his mental illness. (Tr. 23). Specifically, an act such as creating a false medical excuse would be consistent with the combination of overconfidence and recklessness that characterizes bipolar disorder. (Tr. 23–24).

Dr. Miller also concluded that by September 1987 Mr. Hogarth was capable of resuming his duties at the FBI. (Tr. 26, 33–34). Because the plaintiff's medication would buffer him against loss of mood control, Dr. Miller believed that he could perform the responsibilities of a communications operator. (Tr. 26–27). Dr. Miller understood Mr. Hogarth's position to be one without significant stress, but he noted that other persons with bipolar disorder function successfully in more stressful positions such as that of a physician. (Tr. 27, 31, 38–40). Dr. Miller did acknowledge, however, that Mr. Hogarth had been unable to handle the stress of the training program at the State Insurance Fund. (Tr. 55–56). While Dr. Miller felt there would always be some danger of Mr. Hogarth experiencing a misperception of reality or grandiose delusions, there was no substantial likelihood of a destructive recurrence. (Tr. 48). In particular, it was Dr. Miller's opinion that the plaintiff posed no danger of releasing classified information. (Tr. 30–31, 54).

Dr. Lawrence A. Siegel testified as a psychiatric expert on behalf of the Government. He agreed with Dr. Miller that it was likely that Mr. Hogarth's misconduct was caused by his mental illness. (Tr. 228–29). However, he was not so optimistic about the likelihood that the plaintiff could avoid a recurrence of his symptoms. Dr. Siegel noted that a good percentage of persons with bipolar disorder who are treated with lithium carbonate nevertheless suffer relapses. (Tr. 210). The likelihood of recurrence is greater among individuals like Mr. Hogarth who have suffered a psychotic episode, that is, a loss of contact with reality. (Tr. 210–12). And, once a person with bipolar disorder has had a psychotic episode, future recurrences are more likely to involve psychosis. (Tr. 211). Based on his review of the plaintiff's records, Dr. Siegel considered it likely that Mr. Hogarth would suffer relapses. (Tr. 213–15, 243).

The plaintiff testified that the possibility of recurrence could have been eliminated if the FBI had been willing to monitor his compliance with his medication regimen. Mr. Hogarth was willing to take blood tests to verify the level of medication in his body and to visit his psychiatrist as often as necessary. (Tr. 78–79). An FBI administrator objected that such monitoring should not be required of the agency. (Tr. 187). Beyond that, Dr. Siegel testified that although monitoring would reduce the likelihood of a relapse, it would not eliminate it; even hospitalized patients suffer recurrences before the medical staff is able to intervene. (Tr. 240–41).

Government witnesses testified that Mr. Hogarth would no longer qualify for a top secret security clearance. Such clearance is required for all FBI employees because of their actual or potential access to classified information. (Tr. 135, 138–39). In determining the qualification of an applicant for clearance, the FBI considers such characteristics as reliability, dependability, and stability. (Tr. 137). In the instant case, the FBI would no longer grant a clearance to Mr. Hogarth based on the acts of fraud and sexual misconduct while on duty and based on the possibility that he will suffer recur-

rent misperceptions of reality due to his mental illness. (Tr. 142–50).

Finally, Mr. Hogarth presented evidence that the FBI has provided substantial accommodations for its employees who have been disabled by alcoholism. One agent, for example, had four episodes of drunkeness, during which he passed out, suffered loss of memory, and on one occasion misplaced his weapon. (Tr. 159–61; Pl.Exh. 13). Nevertheless, he was not discharged until after the fourth episode. (Tr. 161–62). Dr. Miller testified that persons suffering from alcoholism always run the risk of relapse and that alcoholics can be delusional and suffer memory lapses. (Tr. 28).

With respect to the specific instance cited, a former Assistant Director of the FBI testified that while the loss of a weapon was serious, it was too commonplace to justify termination. (Tr. 201–02). Further, this witness could not state whether any of the FBI employees treated for alcoholism had been delusional. (Tr. 196–97). Dr. Siegel testified that the symptoms of alcoholism are not parallel to those of bipolar disorder. (Tr. 243). While someone may experience psychosis and hallucinations as a result of brain damage in the end stages of alcoholism, such symptoms would be unlikely in someone who has not engaged in years of heavy drinking. (Tr. 243–44).

*Discussion*

### A. *Statutory Framework*

There is some ambiguity in this case regarding the applicable statutory scheme. In the complaint, Mr. Hogarth refers exclusively to remedies applicable to claims under section 501 of the Rehabilitation Act of 1973 (the "Act"), 29 U.S.C. § 791, which concerns employment of handicapped persons by federal governmental agencies. In the joint pretrial order, however, the parties characterized the plaintiff's claims as arising under section 504 of the Act, 29 U.S.C. § 794, which prohibits discrimination on the basis of handicap by programs or activities receiving federal financial assistance or conducted by a federal agency.

When it was originally enacted, section 501 did not provide for a private right of action.

By contrast, the courts readily held that there was an implied private right of action under section 504. *See Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir.1977). In amending the Act in 1978, however, Congress explicitly stated that the rights and remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* would apply to section 501. 29 U.S.C. § 794a(a)(1). At the same time, the procedures under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.,* were to apply to claims under section 504. 29 U.S.C. § 794a(a)(2).

This statutory evolution created some confusion about the relationship between sections 501 and 504. Some courts have taken the position that section 501 provides the exclusive remedy for federal employees claiming discrimination on the basis of handicap. *See Boyd v. United States Postal Service,* 752 F.2d 410, 413 (9th Cir.1985); *McGuinness v. United States Postal Service,* 744 F.2d 1318, 1321 (7th Cir.1984); *DiPompo v. West Point Military Academy,* 708 F.Supp. 540, 544–46 (S.D.N.Y.1989). Others have held that the two sections provide overlapping protections for handicapped federal employees. *See Morgan v. United States Postal Service,* 798 F.2d 1162, 1164–65 (8th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *de la Torres v. Bolger,* 781 F.2d 1134, 1135–36 (5th Cir.1986); *Prewitt v. United States Postal Service,* 662 F.2d 292, 304 (5th Cir. Unit A Nov. 1981).

This issue has not been addressed by the Second Circuit, and for purposes of this decision it need not be resolved. Section 501 incorporates the procedural requirements of Title VII, including administrative exhaustion obligations, which do not apply in section 504 cases. However, in this case the government has abandoned any defense based on the plaintiff's purported failure to file his administrative complaint of handicap discrimination in a timely fashion. (Tr. 2). And, although only section 501 places affirmative action obligations on the federal government, Mr. Hogarth has consistently litigated this action as a straightforward anti-discrimination claim cognizable under either section 501 or section 504. Finally, the substantive obligations

placed upon an employer not to discriminate on the basis of handicap are the same, whether the claim is raised under section 501 or section 504. Indeed, the regulations promulgated to implement these respective sections are substantially the same. *Compare* 29 C.F.R. §§ 1613.701–1613.707 (section 501) *with* 45 C.F.R. §§ 84.1–84.14 (section 504). Accordingly, the determination in this action will rely on law that has developed under both sections.

■ The basic protections afforded to a handicapped person by section 504 are stated as follows:

No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[2]

29 U.S.C. § 794. Thus, in order to establish a violation of section 504 in the context of employment discrimination, a plaintiff must prove (1) that he is a "handicapped person" under the Act, (2) that he is otherwise qualified for the position in question, (3) that he is being excluded from the position solely on the basis of his handicap, and (4) that the position is part of a program or activity receiving federal financial assistance or conducted by a federal agency. *See Doe v. New York University,* 666 F.2d 761, 774–75 (2d Cir.1981).

In the instant case, there is no dispute that Mr. Hogarth is a handicapped person as defined by the Act. "[T]he term 'handicapped individual' means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."[3] 29

U.S.C. § 706(7)(B); *see also* 45 C.F.R. § 84.-3(j); 29 C.F.R. § 1613.702(a). Even if there is controversy over whether Mr. Hogarth's bipolar disorder is currently disabling, there is agreement that he at least has a record of such an impairment.

Similarly, there is no question here that the fourth requirement is met: employment by the FBI is an activity conducted by an executive agency. There is a dispute, however, regarding the second and third prongs of the standard. The government contends first that Mr. Hogarth was terminated from employment with the FBI not for his handicap but for the specific acts of misconduct. Second, it argues that the plaintiff is not "otherwise qualified" for a position as communications operator with the FBI.

### B. *Basis for Termination*

According to the government, the FBI dismissed Mr. Hogarth for submitting a fraudulent doctor's note, for engaging in sexual misconduct while at work, and for not being fully candid when interviewed about his actions. The government contends that because the FBI did not rely on the existence of Mr. Hogarth's handicap in discharging him, his termination cannot have violated the Act. This sharp distinction between a handicapping condition on one hand and specific behavior on the other is a view endorsed by a number of courts. *See Lucero v. Hart,* 915 F.2d 1367, 1372 (9th Cir.1990); *Wilber v. Brady,* 780 F.Supp. 837, 840 (D.D.C.1992); *Richardson v. United States Postal Service,* 613 F.Supp. 1213, 1215–16 (D.D.C.1985); *Guerriero v. Schultz,* 557 F.Supp. 511, 513–14 (D.D.C.1983).

■ However, it is a position that has been soundly rejected by the Second Circuit:

[T]he handicap and its consequences are distinguished for purposes of § 504 only in assessing whether or not the firing was discriminatory. If the consequences of the handicap are such that the employee is not

---

**2.** Subsequent to the incidents described here, this provision was revised so as to substitute the term "individual with a disability" for "handicapped person." The provision is otherwise substantively the same. *See* 29 U.S.C. § 794(a) (Supp.1993).

**3.** *See supra* note 2; 29 U.S.C. § 706(8)(B) (Supp. 1993).

qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing *is* "solely by reason of" the handicap.

*Teahan v. Metro–North Commuter Railroad Co.,* 951 F.2d 511, 516 (2d Cir.1991) (emphasis in original), *cert. denied,* — U.S. —, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). Thus, "an employer 'relies' on a handicap when it justifies termination based on conduct caused by the handicap. An employer does *not* 'rely' on a handicap when it can point to behavior that is not causally related to that handicap." *Id.* (emphasis in original).

Accordingly, if a handicap manifests itself in certain behavior, and an employee is discharged because of that behavior, he has been terminated "solely by reason of" the handicap. As the court pointed out in *Teahan,* this is the only logical interpretation of the Act. Adopting the government's reasoning would mean that a person with a limp could be terminated for the "thumping" noise made when he walks, even if the sound has no relation to his job performance. *See id.* at 516–17. Similarly, a person with epilepsy could be fired for "falling down" without any showing by the employer that it is a legitimate job requirement that the employee be seizure-free.

The Government's analysis is also flawed because it appears to invite an inquiry into the state of mind of the employer: did the employer intend to discharge the employee because of the underlying handicap or merely because of its overt manifestation? But as the Supreme Court observed in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.* at 295, 105 S.Ct. at 717 (footnote omitted). The congressional goal of eliminating such thoughtless discrimination is hardly advanced if an employer is permitted to raise a "pure heart, empty head" defense, claiming that it was unaware of the relation between the handicap and its manifestations and therefore should not be required to demonstrate

why the conduct precludes the employee from being "otherwise qualified."

■ Thus, if an employee is discharged for conduct which is the manifestation of a handicap, he has been sanctioned "solely by reason of" his disability. That was the case here. The parties agree that the FBI terminated Mr. Hogarth because of his misconduct. However, the expert witnesses for both the plaintiff and the Government testified that this behavior was attributable to the plaintiff's mental disability. (Tr. 23–24, 228–29). Therefore, the proper focus of the inquiry here is whether, given this handicap, Mr. Hogarth is otherwise qualified to perform his responsibilities at the FBI.

### C. *Otherwise Qualified*

Since it has been established that the FBI relied on the manifestations of Mr. Hogarth's disability in deciding to terminate him, it is appropriate to use the analytical framework set forth in *Doe v. New York University* to determine whether he was otherwise qualified for his position:

> [I]n a suit under § 504 the plaintiff may make out a prima facie case by showing that he is a handicapped person under the Act and that, although he is qualified apart from his handicap, he was denied admission or employment because of his handicap. The burden then shifts to the institution or employer to rebut the inference that the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position sought. The plaintiff must then bear the ultimate burden of showing by a preponderance of the evidence that in spite of the handicap he is qualified. . . .

666 F.2d at 776–77 (citation omitted). As discussed above, it is undisputed that Mr. Hogarth is a handicapped person. Further, it was established at trial that he was qualified for the position of communications operator, a job that he performed satisfactorily for several years prior to his termination.

■ The burden then shifts to the government to demonstrate that Mr. Hogarth's disability is "relevant" to the job qualifications

for his position. This is a low threshold. It does not require the employer to prove that handicapped persons are unable to perform the job in question. Rather, the employer must show simply that there is a logical connection between the type of disability possessed by the plaintiff and the requirements of the job. This is designed to identify cases in which the employer's action has no possible rational basis and is discriminatory on its face. For example, an individual's limp would probably be irrelevant to his ability to function as a cashier, while a deformity of the hands would be relevant. In the latter example, the plaintiff would nevertheless have the opportunity to go on to prove that he could perform the job despite his disability.

■ In this case the government has met its burden of showing that Mr. Hogarth's disability is relevant to his ability to function as a communications operator. The ability to perceive reality correctly is surely pertinent to whether an employee can transmit and receive documents properly. And, of course, mental stability is all the more relevant where the communications at issue involve classified information. Accordingly, it is necessary to turn to the final step in the analysis: the issue of whether, in spite of his handicap, the plaintiff can perform his job responsibilities.

■ In order to be considered "otherwise qualified," an employee must be able to perform all essential functions of a job, either with or without reasonable accommodation. *See Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Cook v. United States Department of Labor,* 688 F.2d 669, 670 (9th Cir.1982) (per curiam), *cert. denied,* 464 U.S. 832, 104 S.Ct. 112, 78 L.Ed.2d 113 (1983); *Doe v. New York University,* 666 F.2d at 775, 777; *Serrapica v. City of New York,* 708 F.Supp. 64, 73 (S.D.N.Y.), *aff'd mem.,* 888 F.2d 126 (2d Cir.1989). Here the government presented evidence that all FBI employees must have a security clearance. Whether or not the formality of the clearance is critical, there is no doubt that because all employees potentially have access to classified information, they must be stable, honest, and dependable. These are legitimate re-

quirements for the position of communications operator just as they are for a special agent.

■ All employees, handicapped or not, will fail to perform their job functions properly at some times. In order to evaluate the qualification of a handicapped individual under the Act, it is therefore necessary to analyze two factors: the consequences of a failure to perform and the likelihood of such a failure being caused by the handicapping condition. *See Serrapica,* 708 F.Supp. at 73–75; *Davis v. Meese,* 692 F.Supp. 505, 520–21 (E.D.Pa.1988), *aff'd per curiam,* 865 F.2d 592 (3d Cir.1989); *Wallace v. Veterans Administration,* 683 F.Supp. 758, 766–67 (D.Kan. 1988).

In some cases, the possibility that a disability will interfere with job performance poses dramatic dangers. In *Doe v. New York University,* for example, the plaintiff was denied admission as a medical student because of mental illness that had caused her to engage in repeated self-mutilation. The possibility of a recurrence would thus have created an imminent danger to her health and that of others. 666 F.2d at 777–78. Similarly, in *Serrapica* the court found that the likelihood that the plaintiff, an uncontrolled diabetic, would suffer a hypoglycemic reaction while operating heavy equipment as a sanitation worker would be an unacceptable risk to himself, to his co-workers, and to the public. 708 F.Supp. at 74–75. For similar reasons, a court has held that an insulin-dependent diabetic was properly excluded from a position as an FBI special agent because of the danger that he could become disabled during a hazardous event such as an arrest or a raid on illegal activities. *Davis v. Meese,* 692 F.Supp. at 510, 519.

■ The dangers posed by Mr. Hogarth having a recurrence of his mental illness while on the job are not so dramatic, but neither are they minimal. The plaintiff argued that he had never revealed classified information and his psychiatrist testified that the chances of his doing so in the future were small. However, I can give little credence to this prediction. Because of his mental illness, Mr. Hogarth has suffered substantial

breaks from reality: he believed that a nuclear attack was imminent, he thought the radio was speaking directly to him, and he felt he was under surveillance. Moreover, he acted on these delusions by phoning a warning to the Strategic Air Command and telling the Secret Service that he was a threat to the President. I cannot be so sanguine that if he were to suffer a recurrence, Mr. Hogarth would not release classified information if to do so were consistent with his misperception of reality at the time. Were he to do so, the consequences could be quite serious, since the information he had access to involved both counterintelligence and ongoing criminal investigations.

Furthermore, a future mental breakdown would not have to involve a breach of security in order to have severe repercussions. Because of the nature of the information conveyed by the FBI, a simple failure by Mr. Hogarth to perform his duties properly could be dangerous. The failure to transmit information to a special agent in the field could place that agent in jeopardy. A decision not to pass along data about foreign counterintelligence could adversely affect governmental decisionmaking. Thus, the dangers posed by a recurrence of the plaintiff's mental illness are substantial.

The second consideration—the probability of a relapse—also favors the Government. Mr. Hogarth's psychiatrist testified that once his condition had been controlled with medication the chances of a recurrence were minimal. The Government successfully rebutted this argument in several ways. First, Dr. Siegel testified that lithium therapy is no longer viewed as a guarantee against recurrence of bipolar disorder as it once was. Second, the effectiveness of any regimen of medication depends on the patient's compliance. Finally, events subsequent to Mr. Hogarth's termination have proven Dr. Miller wrong: the plaintiff has indeed suffered repeated episodes of mental illness.

At trial, the plaintiff objected to introduction of evidence concerning his mental health after September 1987 when he contends he was able to return to his position at the FBI. (Tr. 3–4). But where the issue to be decided is the likelihood that an event will occur, the fact that it did occur is perhaps the most probative evidence possible. The Second Circuit certainly took this approach in *Doe v. New York University.* There the plaintiff had been denied readmission to medical school in 1977, but the court considered her psychiatric and work history up to the date of trial. 666 F.2d at 769–70.

In the instant case, the course of Mr. Hogarth's illness after his termination from the FBI leaves no doubt that the possibility of further recurrence renders him unqualified to return to his former position. At various times after September 1987 the plaintiff has suffered mood swings and feelings of paranoia. While in a training program, he had a relapse which, though his psychiatrist characterizes it as "minor," was sufficiently serious to cause him to seek workers compensation benefits after he was fired from the program. He later suffered additional paranoid delusions and ultimately contacted the Secret Service when he came to believe that he was a threat to the President. All of these episodes occurred after he was under the care of a psychiatrist and receiving medication. There can thus be little assurance that he will not experience similar recurrences in the future.

### D. *Reasonable Accommodation*

██ To this point, I have analyzed Mr. Hogarth's situation without regard to whether there are reasonable accommodations that the FBI could provide that would permit him to perform the essential functions of his job satisfactorily. The plaintiff contends that there are two such accommodations available. First, the FBI could make arrangements for monitoring of his condition and his compliance with medication, thus reducing the possibility of a recurrence of his symptoms. Second, the plaintiff argues that the FBI could limit his access to confidential information, thereby reducing the risk of serious consequences if he should have a relapse. It is the burden of the employer, in this case the FBI, to demonstrate that such accommodations are not feasible. *See Prewitt v. United States Postal Service,* 662 F.2d at 308; *Nisperos v. Buck,* 720 F.Supp. 1424,

1432 (N.D.Cal.1989), *aff'd mem.*, 936 F.2d 579 (9th Cir.1991).

A proposed accommodation is unreasonable if it imposes undue financial and administrative burdens on the employer or requires a fundamental alteration in the nature of the program. *See School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Southeastern Community College v. Davis*, 442 U.S. at 410, 412, 99 S.Ct. at 2370. Here, the government has not demonstrated that monitoring of the plaintiff's condition would be unduly burdensome. One FBI official merely stated in conclusory fashion that it would go "beyond what an organization, an agency has to accept." (Tr. 187). The government did establish, however, that a substantial risk of recurrence would persist, even if Mr. Hogarth's condition were carefully monitored. Dr. Siegel observed that within a normal workday, the FBI could not both observe the plaintiff take his medication and test his blood twelve hours thereafter, as would be necessary for proper monitoring. (Tr. 245). Moreover, even in a hospital setting where the patient is closely monitored, relapses occur before they can be anticipated. (Tr. 240–41). Thus, even if this form of accommodation is reasonable, it will not permit Mr. Hogarth to perform the essential functions of the job.

The alternative accommodation suggested by Mr. Hogarth is equally infeasible. The FBI could, perhaps, maintain security by preventing Mr. Hogarth from having access to classified information. However, this would mean virtually duplicating his position, since someone would have to screen both incoming and outgoing documents to determine if the plaintiff could see them. Although employers cannot deny handicapped persons job restructuring or alternative positions within the existing employment schemes, "they are not required to find another job for an employee who is not qualified for the job he or she was doing...." *School Board of Nassau County, Florida v. Arline*, 480 U.S. at 289 n. 19, 107 S.Ct. at 1131 n. 19. Nor is an employer obligated to fundamentally alter its employment scheme by rewriting job descriptions. *See Serrapi-*

*ca*, 708 F.Supp. at 73. In this case, the FBI cannot be expected to waive the security clearance requirements that apply to all employees, nor should it be forced to overhaul the position of communications operator for Mr. Hogarth so that he would be presented with only nonclassified information.

The evidence proffered by Mr. Hogarth regarding the FBI's accommodation of alcoholic employees does not alter this conclusion. While both alcoholism and bipolar disorder are handicapping conditions, they have different attributes and may appropriately be treated differently by an employer. Moreover, the reasonableness of an accommodation must be judged in relation to a particular handicapped individual, not to some theoretical class of persons with similar disabilities. Thus, it was wholly appropriate for the FBI to provide a second and third chance to an alcoholic agent who, though temporarily negligent and forgetful while under the influence of alcohol, was never found to be delusional. At the same time, it was not inconsistent for the agency to terminate the plaintiff after he had had a serious psychotic episode with a significant potential for recurrence.

The government, then, has carried its burden of showing that there are no reasonable accommodations that would allow Mr. Hogarth to perform the duties of his position at the FBI. The plaintiff is therefore not an otherwise qualified handicapped individual and cannot prevail under the Act.

*Conclusion*

For the reasons set forth above, judgment is granted in favor of the defendants dismissing the complaint. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.