**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALBERT LASSITER,
<u>Plaintiff-Appellant,</u>

v.

JANET RENO, United States Attorney
General; EDUARDO GONZALEZ,

No. 95-2058

Director, United States Marshal
Service; HELEN F. FAHEY, United
States Attorney; U.S. MARSHAL
SERVICE,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-94-626)

Argued: March 6, 1996

Decided: May 29, 1996

Before RUSSELL, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Bertram Mann, LEVIT & MANN, Richmond, Virginia, for Appellant. Nicholas S. Altimari, Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Albert L. Lassiter challenges the district court's entry of summary judgment on his disability discrimination claim in favor of Janet Reno, Attorney General and department head of Lassiter's former employer, the United States Marshal Service (USMS). Lassiter contends that the district court erred in concluding that he had failed to demonstrate that he was "otherwise qualified" under the Rehabilitation Act of 1973 (the Rehabilitation Act), 29 U.S.C.A. §§ 791(b), 794(a) (West Supp. 1995). Because we agree with the district court that Lassiter is unable to demonstrate that he can perform, with reasonable accommodation, the essential functions of his former position as Deputy United States Marshal, see Myers v. Hose, 50 F.3d 278, 282 (4th Cir. 1995), we affirm.

I.

Lassiter served as a deputy marshal in the USMS from 1970 until his termination in 1992 on the ground that he was medically unfit to perform his duties. In his final, written performance appraisal, Lassiter's supervisors rated him as either excellent or outstanding in the discharge of his duties.

The sequence of events that eventually led to Lassiter's termination began in late 1990. Lassiter began to suspect that his elderly neighbor, her grandson, and other, unidentified individuals were conspiring to burglarize his home. Lassiter based his suspicion on a number of occurrences, including, for example, his observation of various trucks and cars slowing down as they passed his house and his receipt of hang-up phone calls that Lassiter traced to relatives of his neighbor through his caller-identification system. Lassiter contacted several officers of the Chesterfield County Police Department (CCPD) and expressed his concerns. In one conversation, a CCPD officer warned

2

Lassiter that he could not shoot the burglars; Lassiter responded that if he could not, the CCPD should "[h]ave a homicide unit standing by." (J.A. at 43.) After an investigation into Lassiter's concerns, the CCPD concluded that no conspiracy existed.

Lassiter remained convinced that he was the target of a putative conspiracy. To foil the alleged burglary ring, Lassiter pretended that he was away for the Christmas holidays. When he returned from work, Lassiter parked his car away from his home and entered his house through the side door. To simulate absence, Lassiter did not turn on any lights, answer the phone, pick up his mail, wash dishes, cook food in the oven, or flush the toilets. In preparation for the intruders, Lassiter wore his firearm in its holster, donned a bullet-proof vest, placed duct tape on all the numbers on one phone except nine and one so he could call the police in the dark if required, and remained in contact with the CCPD on another phone. Lassiter notified the police dispatchers that he would be armed with a double-barrel shotgun and a .45 caliber automatic pistol, and warned them that the only way the burglars would remove his United States Marshal's arm band would be if he were dead.

To ensure he would be alert when the burglars made their move, Lassiter slept by day and remained awake all night. On the afternoon of December 23, Lassiter refused to answer his door when a CCPD officer arrived to investigate a neighbor's complaint that Lassiter was armed and threatening to kill people. Later, in the early morning hours of December 24, the CCPD responded to another telephone call from Lassiter. When the officers arrived, they found Lassiter armed with an automatic weapon, two magazine rounds, a night-vision scope, and the bullet-proof vest. After observing the unwashed dishes, the unflushed toilets, and firearms, the officers became concerned that Lassiter was heavily armed and acting in an increasingly agitated manner. The officers departed but returned after obtaining a Temporary Detention Order directing that Lassiter be committed to Charter Westbrook Hospital for psychiatric evaluation. During his approximately three-week commitment, Lassiter continued to believe the conspiracy existed and "cheeked" [1] some of the medication provided

---

[1] Lassiter pretended to swallow the medicine given to him, but spit it out after the hospital personnel left.

to him because he did not trust the hospital personnel assigned to care for him. Eventually, Lassiter concluded that the doctors, staff, and his roommate at the hospital, members of the CCPD, and his pharmacist, as well as his neighbors, were all involved in the conspiracy against him.

Two weeks after his discharge from Charter Westbrook, the USMS arranged to have Dr. Thomas Mathews examine Lassiter. Dr. Mathews diagnosed Lassiter as suffering from delusional (paranoid) disorder[2] and opined that while Lassiter was not precluded from general employment with the USMS, he should be deprived of his weapon and relieved of any duties that would necessitate his carrying a weapon. After officials from the USMS explained to Dr. Mathews that it would be impossible to serve as a deputy marshal without carrying a gun, Dr. Mathews recommended that Lassiter be declared medically unfit for duty.

After receiving the results of Dr. Mathews's examination, Lassiter enlisted the services of three other psychiatrists to evaluate his condition. First, Dr. Melvin Stern diagnosed Lassiter as suffering from paranoid personality disorder,[3] but opined that Lassiter was not pres-

_____

[2] The Diagnostic and Statistical Manual of Mental Disorders, third edition, revised (DSM-IIIR), defines delusional (paranoid) disorder as "the presence of a persistent, nonbizarre delusion that is not due to any other mental disorder." (J.A. at 197.) The persecutory type of this disorder is described as follows:

> The persecutory delusion may be simple or elaborate, and usually involves a single theme or series of connected themes, such as being conspired against, cheated, spied upon, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. Small slights may be exaggerated and become the focus of a delusional system. In certain cases the focus of the delusion is some injustice that must be remedied by legal action . . . , and the affected person often engages in repeated attempts to obtain satisfaction by appeal to the courts and other government agencies. People with persecutory delusions are often resentful and angry, and may resort to violence against those they believe are hurting them.

(J.A. at 198.)

[3] The DSM-IIIR states that "[t]he essential feature of this disorder is a pervasive and unwarranted tendency, beginning by early adulthood and

4

ently dangerous and "recommend[ed] that he be allowed to return to work including having the right to bear arms in the same capacity of Deputy U.S. Marshal that he had prior to his being hospitalized." (J.A. at 58-59.) Second, Dr. Juliann Hanback also opined that Lassiter had paranoid personality disorder, but recommended that Lassiter obtain psychiatric treatment or regular psychiatric assessments before regaining the right to own and carry firearms. Third, Dr. Paul Travis recommended that Lassiter be evaluated by a specialist in paranoid disorders.

After careful consideration of the reports of the examining psychiatrists and review of the events of late 1990, officials at the USMS decided to relieve Lassiter of his duties as a deputy marshal in May 1992. In an effort to accommodate Lassiter, the USMS attempted to place Lassiter in an administrative position in which he would not have to carry a firearm. However, because the search for a vacant position within Lassiter's commuting area was fruitless, the USMS terminated Lassiter's employment.

After the USMS terminated Lassiter's employment, Lassiter consulted a fourth psychiatrist, Dr. David Daniel. Based on his examination, Dr. Daniel concluded that "Lassiter suffers from paranoid personality disorder and has a very low potential for impulsive violence." (J.A. at 72.)

After exhausting his administrative remedies,[4] Lassiter commenced

_____

present in a variety of contexts, to interpret the actions of people as deliberately demeaning or threatening." (J.A. at 202.)

[4] Shortly after his termination, Lassiter appealed the USMS's decision to the Merit Systems Protection Board (MSPB). Following a hearing, an MSPB administrative law judge (ALJ) held that the USMS did not discriminate against Lassiter in violation of the Rehabilitation Act. In particular, the ALJ accorded more weight to Dr. Mathews's testimony than that of Lassiter's expert witnesses, who maintained that Lassiter suffered from a paranoid personality disorder but was not delusional, because Dr. Mathews's opinion was better supported by the narrative provided by Lassiter to the experts and because Lassiter's experts had not examined Lassiter until months after his hospitalization. Additionally, the ALJ held

5

this action in the United States District Court for the Eastern District of Virginia against the USMS, the Attorney General, the United States Attorney for the Eastern District of Virginia, and Eduardo Gonzalez, the Director of the USMS, alleging that his termination violated the Rehabilitation Act and the Virginia Human Rights Act, Va. Code Ann. §§ 2.1-714 to -725 (Michie 1995). The district court dismissed all claims against all parties except for the Rehabilitation Act claim against the Attorney General. The district court subsequently granted summary judgment in favor of the Attorney General on the Rehabilitation Act claim, holding that Lassiter had failed to offer evidence raising a genuine issue of material fact on the issue of Lassiter's ability to perform the essential functions of his position with or without a reasonable accommodation for his disability.

Lassiter appeals only the district court's entry of summary judgment on his Rehabilitation Act claim, contending that (1) a genuine issue of material fact existed as to whether Lassiter could perform the essential functions of a deputy marshal and (2) the USMS had failed to reasonably accommodate Lassiter's disability. After briefly discussing our standard of review on summary judgment and setting forth the framework for analyzing claims under the Rehabilitation Act, we address Lassiter's arguments in turn.

II.

Rule 56(c) of the Federal Rules of Civil Procedure requires the district court to enter summary judgment against a party who, "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To prevail on a motion

_____

that Lassiter had failed to show that a reasonable accommodation for his disability existed. The MSPB affirmed the ALJ's initial ruling that Lassiter was medically unfit for his position, and the Equal Employment Opportunity Commission subsequently concurred with the MSPB's findings. Despite these administrative adjudications, Lassiter was entitled to a trial de novo on his discrimination claim in the district court. See Chandler v. Roudebush, 425 U.S. 840, 863 (1976).

6

for summary judgment, the Attorney General must "show that there is no genuine issue as to any material fact and that[she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, all reasonable inferences must be construed in favor of Lassiter. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted). We review Lassiter's challenge to the district court's entry of summary judgment de novo. Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1120 (4th Cir. 1995).

Lassiter claims that he was unlawfully discharged from his position as a deputy marshal because of his disability in violation of sections 501 and 504 of the Rehabilitation Act. See 29 U.S.C.A. §§ 791(b), 794(a).**5** Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . conducted by any Executive agency." 29 U.S.C.A.§ 794(a). For Lassiter to establish a violation of section 504, he must prove: "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." Doe v. University of Md. Medical Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995).

Under the Rehabilitation Act, an individual with a disability is defined as a person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C.A. § 706(8)(b) (West Supp. 1995). The Attorney General does not dispute that the USMS regards Lassiter as being disabled, see Forrisi v. Bowen , 794 F.2d 931, 934 (4th Cir. 1986) (recognizing that even though the employee does not

_____

**5** Because Lassiter "has consistently litigated this action as a straight-forward anti-discrimination claim cognizable under section 501 or section 504," we shall treat it as such. See Hogarth v. Thornburgh, 833 F. Supp. 1077, 1083 (S.D.N.Y. 1993).

believe that he is disabled, he is considered to be an individual with a disability under the Rehabilitation Act if the employer regards the employee as having a disability), nor does she contend that the USMS terminated Lassiter for a reason other than his disability. Thus, we focus our discussion on the second element of the test: Whether Lassiter was otherwise qualified under the Rehabilitation Act.

A disabled person is otherwise qualified for a position if he "can perform `the essential functions' of the job in question." School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 n.17 (1987). If the disabled individual is unable to perform the essential functions of the position, the employee's termination may nevertheless be unlawful if the employer has failed to provide a reasonable accommodation that "would enable the handicapped person to perform those functions." Id. Keeping this framework in mind, we now turn to Lassiter's arguments.

A.

Lassiter first contends that he offered sufficient evidence in the district court to raise a genuine issue of material fact as to whether he is otherwise qualified under the Rehabilitation Act. To be otherwise qualified, Lassiter must be able to perform the essential functions of his position without "pos[ing] a significant risk to the health or safety of others by virtue of [his] disability that cannot be eliminated by reasonable accommodation." Doe, 50 F.3d at 1265. In assessing whether an employee can perform his duties without a significant risk to the safety of himself or others, we must consider the nature of the position and the consequences should the employee fail to perform his duties properly. See id. at 1265-66 (discussing risk posed by HIV-positive surgeon); Myers, 50 F.3d at 282 (analyzing consequences if diabetic bus driver's blood sugar rose above the proper level); Hogarth v. Thornburgh, 833 F. Supp. 1077, 1086 (S.D.N.Y. 1993) (stating the necessity of evaluating "the consequences of a failure to perform and the likelihood of such a failure"). For a law enforcement officer, the failure to perform one's duties properly can result in dramatic repercussions, placing others in imminent peril. See Butler v. Thornburgh, 900 F.2d 871, 876 (5th Cir.), cert. denied, 498 U.S. 998 (1990); Hogarth, 833 F. Supp. at 1087. Indeed, the USMS maintains strict medical standards for the mental fitness of its deputy marshals,

8

requiring that they have no "history of a basic personality disorder." (J.A. at 559.)

The parties do not dispute that carrying a firearm is an essential function of a deputy marshal, whose duties require confrontation of potentially hostile situations and evaluation of whether deadly force is needed.[6] Thus, we are faced with the question of whether the evidence Lassiter offered was sufficient to raise a genuine issue as to whether he would be able to perform his duties, including carrying a firearm, without posing a significant risk to the safety of himself or others.

In support of his assertion that a genuine issue of material fact exists as to whether he poses a significant risk to the safety of others, Lassiter refers us to the reports of two of his experts, Drs. Stern and Daniel, who opine, respectively, that Lassiter should be returned to employment in the same capacity including the right to bear a firearm and that Lassiter has a low potential for impulsive violence. Additionally, Lassiter contends that the deposition testimony of Dr. Mathews, who declared Lassiter medically unfit for duty, represents further evidence of a genuine issue of material fact. In his deposition, Dr. Mathews answered in the negative when asked whether there was "a reasonable likelihood that . . . Lassiter will become violent, and therefore, should not carry a weapon." (J.A. at 533.)

_____

[6] The Attorney General describes the duties of a deputy marshal in the following manner:

> The duties of the DUSM position require plaintiff to investigate and apprehend several types of federal fugitives, including escapees, and bond, probation, and parole violators. In addition, DUSM's are responsible for investigating, seizing, maintaining, and disposing of drug-related assets seized pursuant to federal drug and forfeiture laws. Moreover, DUSM's provide security for judges, courtrooms, witnesses, prisoners, and juries at threat-sensitive trials, including espionage, terrorism, and drug cases. Deputy U.S. Marshals maintain custody of and transport dangerous prisoners. Finally, Deputy U.S. Marshals execute both criminal and civil federal court process.

(Appellee's Br. at 10 n.2.)

9

We cannot agree with Lassiter's contention. Upon reviewing the opinions of Drs. Stern and Daniel and the testimony of Dr. Mathews, it is evident that there is no genuine issue of material fact that Lassiter cannot perform his duties without posing a significant risk to the safety of himself or others. The opinions of Drs. Stern and Daniel and the testimony of Dr. Mathews show only that Lassiter has a low potential for impulsive violence, not that he does not pose a significant risk to the safety of himself or others.

Although Dr. Stern does opine that the USMS should return Lassiter to his duties, including carrying a firearm, Dr. Stern's report does not represent probative evidence raising a genuine issue of material fact because his conclusion is based not on whether Lassiter poses a significant risk to the safety of himself or others, but rather on Dr. Stern's belief that Lassiter is not "presently dangerous." (J.A. at 58.) In his report, Dr. Stern diagnosed Lassiter as suffering from paranoid personality disorder and warned that persons with this disorder are overly suspicious, "have an expectation of being exploited or harmed by others[,]" and "have a tendency to read hidden, demeaning or threatening meanings into benign remarks or events." (J.A. at 58.) Stern concluded, however, that Lassiter is not presently dangerous because persons with paranoid personality disorder are unlikely to "strik[e] out impulsively" in a violent manner. (J.A. at 58.)

Agreeing that Lassiter suffers from paranoid personality disorder, Dr. Daniel also opined that Lassiter "has a very low potential for impulsive violence." (J.A. at 72.) Similarly, however, Dr. Daniel reported that persons with paranoid personality disorder display a "pervasive and unwarranted tendency . . . to interpret the actions of people as deliberately demeaning or threatening." (J.A. at 69 (internal quotation marks omitted).) Regarding Lassiter's erratic behavior in December 1990, Dr. Daniel further opined that Lassiter's misinterpretation of the events was not a delusion, but more likely an "over-valued idea" or an "idea[ ] of reference." (J.A. at 70 (internal quotation marks omitted).) Dr. Daniel defines an over-valued idea as an "unreasonable and sustained belief or idea" and an idea of reference as an "idea[ ] . . . that events, objects, or other people in the person's immediate environment have a particular and unusual meaning specifically for him." (J.A. at 69-70 (internal quotation marks omitted).)

10

Dr. Mathews's admission that Lassiter was not reasonably likely to become violent similarly does not represent probative evidence of a genuine issue of material fact, because, again, the inquiry is not whether Lassiter is reasonably likely to become violent, but whether Lassiter poses a significant risk to the safety of himself or others. When asked whether Lassiter "pose[d] a reasonable probability of substantial harm[,]" a question whose phrasing resembles the issue at hand, Dr. Mathews responded unequivocally in the affirmative. (J.A. at 483.)

The opinions of Drs. Stern and Daniel and the testimony of Dr. Mathews support the conclusion that Lassiter is unlikely to strike out impulsively with violence; however, they do not contradict the overwhelming evidence in the record that Lassiter, when carrying a firearm in the course of his duties, poses a significant risk to the safety of himself and others. Given the duties of a deputy marshal, a significant risk to the safety of others can arise not only from an inclination to strike out in violence, but also from a tendency to misperceive the true nature of events. Cf. Hogarth, 833 F. Supp. at 1086 (noting danger posed by Federal Bureau of Investigation agent's potential misperception of reality). Placed in unfamiliar circumstances that may or may not be hostile, the deputy marshal must have the ability to decide in an instant whether the use of deadly force is warranted. If an innocent person is injured or killed because a deputy marshal "read . . . threatening meanings into benign remarks or events[,]" (J.A. at 58,) "it is not difficult to imagine the public outrage, let alone the potential liability" to which the federal government would be subjected, Myers, 50 F.3d at 282 (internal quotation marks omitted).

After careful consideration of the psychiatrists' evaluations and Lassiter's own account of the events of December 1990, the USMS made a reasoned, informed decision to terminate Lassiter. The sole conclusion the record supports is that public safety was the USMS's only interest when it arrived at its decision. Under these circumstances, "[w]e are reluctant . . . to substitute our judgment for that of" the USMS. Doe, 50 F.3d at 1266. Because Lassiter is unable to offer evidence sufficient to raise a genuine issue of material fact, we hold that the district court did not err in concluding that Lassiter is unable to perform the essential functions of his job without posing a significant risk to the health and safety of himself and others.

11

B.

Next, Lassiter asserts that even if he is unable to perform the essential functions of his position, his termination was unlawful because the USMS failed to reasonably accommodate his disability. See Arline, 480 U.S. at 287 n.17. Lassiter contends that the USMS did not satisfy its duty of reasonable accommodation because: (1) the USMS did not allow Lassiter to return to work and regain the privilege of carrying a firearm after submitting to periodic psychiatric evaluations; and (2) the USMS failed to reassign Lassiter to an administrative position in which he would not be required to carry a firearm, or, in the alternative, to place Lassiter on a leave of absence until an administrative position opened in the district.

Lassiter contends that the USMS should have reasonably accommodated his disability by allowing him to return to work and regain the right to carry a weapon after periodic psychiatric evaluations, as suggested by Dr. Hanback.[7] Lassiter's argument fails because a disabled employee must be able, with reasonable accommodation, presently to perform the essential functions of his job. See Myers, 50 F.3d at 283. The Rehabilitation Act does not envision requiring "an employer to wait an indefinite period for an accommodation to achieve its intended effect." Id. Thus, Lassiter's suggestion is not a reasonable accommodation under the Rehabilitation Act.

Finally, Lassiter asserts that the duty of reasonable accommodation required the USMS either to transfer Lassiter to an administrative position in which he did not have to carry a firearm, or to place Lassiter on a leave of absence until an administrative position became available. Again, the USMS is not required under the law to go to these lengths to accommodate Lassiter. As a matter of reasonable accommodation, "an employer is not required . . . to transfer or reassign an employee who is not otherwise qualified for the position he

_____

[7] Lassiter contends that Dr. Mathews also suggested this option. However, the record reveals that although Dr. Mathews recommended that Lassiter be allowed to return to work after periodic psychiatric evaluations, Dr. Mathews never intimated that Lassiter should be allowed to carry a firearm after he returned.

12

then holds." **8** <u>Guillot v. Garrett</u>, 970 F.2d 1320, 1327 (4th Cir. 1992); <u>see also Carter v. Tisch</u>, 822 F.2d 465, 468 (4th Cir. 1987) ("None of the courts which have considered the EEOC regulations defining reasonable accommodation have concluded that an alternative assignment is a required accommodation."). Therefore, we conclude that the district court properly entered summary judgment in favor of the Attorney General on the issue of whether a reasonable accommodation existed that would allow Lassiter to perform the essential functions of his job.

III.

For the foregoing reasons, we affirm the decision of the district court granting summary judgment in favor of the Attorney General.

<u>AFFIRMED</u>

_____

**8** Effective October 1, 1992, federal agencies are required to reassign disabled employees to suitable, funded, vacant positions located in the same commuting area provided the reassignment does not impose undue hardship on the operation of the program. <u>See</u> 29 C.F.R. § 1614.203(g) (1995). Because the USMS terminated Lassiter in May 1992, § 1614.203(g) does not apply to this controversy; however, even if it did, the record reflects that no vacant positions that qualified under the regulation existed within Lassiter's commuting area.

13